PROVIDENCE & WORCESTER CO.

v.

BLUE RIBBON BEEF CO., INC.

No. 81-583-Appeal.

Supreme Court of Rhode Island.

July 27, 1983.

Howard E. Walker, Hinckley & Allen, Providence, for plaintiff.

Benedetto L. Zarlenga, Zarlenga & Associates, Providence, for defendant.

## OPINION

KELLEHER, Justice.

This dispute focuses on a parcel of property located in downtown Providence along Canal Street. The tract is unique in that it consists mostly of air space above the Moshassuck River. The property is presently the site of a large brick building and a concrete loading apron that serve as the business premises of the defendant-appellant, Blue Ribbon Beef Company, Inc. (Blue Ribbon). These structures, which remain suspended over the river, are supported by reinforced concrete pilings and steel beams. Blue Ribbon purchased the building and fixtures from Wilson-Sinclair Company in 1976, at which time it assumed that company's lease on the property. Our concern here is not with the ownership of the structures but with the rightful possession of the air space itself. To deal adequately with the issues generated by this dispute, a brief recitation of the events that led to this litigation is in order.

The city of Providence originally leased this area to Wilson-Sinclair Company in 1970 for a term of five years, at which time the lessee had an option to renew for an additional five years. Although the company chose to exercise its option to renew in 1975, it did not remain in possession throughout the remaining term. In 1976 Blue Ribbon agreed to buy the building from Wilson-Sinclair and to assume the other provisions of the lease. The assignment gained the approval of the city as lessor, and Blue Ribbon became the occupants of 276 Canal Street.

Facing a 1980 expiration date, Blue Ribbon approached the city in July of 1978, requesting an extension of the lease. Their efforts appeared successful when the city council on January 3, 1979, passed Resolution No. 1, authorizing the mayor to execute a twenty-year lease to Blue Ribbon for the parcel in question. The mayor approved the resolution, but there was and is a dispute concerning whether he ever executed the instrument. However, the trial justice found as a fact that the lease had not been executed.

While the city was considering Blue Ribbon's extension request, it was also involved in other real estate negotiations with Providence & Worcester Company (Providence & Worcester or P & W), plaintiff in this action. Providence & Worcester and the city were involved in a dispute regarding past-due taxes and certain property surrounding and including a railroad terminal, the one known to many Rhode Islanders as Union Station. Intense negotiations began in the spring of 1978 and reached a successful conclusion approximately one year later, when the city and P & W agreed to a settlement. The terms of that settlement were contained in a memorandum of agreement which was later incorporated into Resolution No. 275. On March 15, 1979, the city council passed this resolution, and the mayor approved it the following week.

The city agreed, as part of the negotiated settlement, to release any right, title, and interest it had in "the real estate in the City of Providence bounded on the north by Smith Street, on the east by Canal Street, on the south by Promenade Street, and on the west by Stillman Street and Gaspee Street." An examination of Blue Ribbon's exhibits reveals that the area deeded to P & W by the city includes the property now occupied by Blue Ribbon. The deed was delivered by the city and recorded by plaintiff in April of 1979.

On May 8, 1980, P & W filed a complaint in District Court claiming ownership of the property at 276 Canal Street and seeking Blue Ribbon's eviction for its failure to pay rent. After an unsuccessful contest in District Court, P & W appealed to Superior Court where it amended its complaint to incorporate most of the facts detailed above. The amended complaint sought a

declaration that Blue Ribbon derived no right, title, or interest by virtue of Resolution No. 1 as well as an order directing Blue Ribbon (1) to surrender possession and (2) to demolish the building as specified in the original lease.

Providence & Worcester's assertions were upheld by a Superior Court justice sitting without a jury. The court concluded that the mayor did not sign the lease extension in favor of Blue Ribbon, thereby rendering the instrument unenforceable. Even if a valid lease were created by the resolution, the trial justice reasoned, P & W would not be bound by it since, as a bona fide purchaser, it took the property without notice of the prior conveyance. The trial justice also ordered Blue Ribbon to demolish, at its own expense, the building at 276 Canal Street. Blue Ribbon appeals to us, claiming that this decision is contrary to the law and against the weight of the credible evidence.

The issue to be resolved here is whether a valid, enforceable lease exists between P & W (as successor in interest to the city of Providence) and Blue Ribbon. In order to make this determination, we must first ascertain the effect of the passing and subsequent approval of the resolution that authorized the extension of the city's lease to Blue Ribbon. That company claims that the city is bound by the lease since the resolution incorporating its essential terms was approved by the mayor and the city council. This action, argues Blue Ribbon, constituted an acceptance of the lease extension on the part of the city which, upon Blue Ribbon's execution of the extension, gave rise to an agreement that was binding upon both parties. Providence & Worcester disagrees and points to a municipal ordinance requiring the mayor's signature on all instruments to which the city is a party. Providence, R.I., Code of Ordinances § 2-21. According to P & W, the mayor's signature on the lease is a must before there can be any binding contract with the city. A review of applicable case law reveals that there is authority to support the litigants' respective points of view. However, we

find that those cases cited by Blue Ribbon are the more persuasive.

Section 2-21 of the Providence Code of Ordinances states:

"All contracts, deeds, leases, conveyances, or other instruments in writing, made and entered into by or on behalf of the city, shall be signed and executed by the mayor, unless otherwise provided by ordinance or resolution of the city council."

Providence & Worcester takes the position that since the lease extension does not bear the mayor's signature, it is void and unenforceable. Providence & Worcester cites numerous cases that stand for the proposition that the failure to comply with a statute or charter provision destroys the validity of a municipal contract. For example, when a city charter requires the legislative body to authorize any agreement entered into by the municipality, the failure to do so renders that agreement void. *Tuxedo Cheverly Volunteer Fire Co. v. Prince George's County,* 39 Md.App. 322, 385 A.2d 819 (1978). Similarly, a city-charter provision requiring the city clerk to certify the availability of funds for any contract involving an expenditure of money was held compulsory in *City of Ft. Pierce v. Scofield Engineering Co.,* 57 F.2d 1026 (5th Cir. 1932).

Courts have held the failure of a municipality's chief executive to sign a municipal contract fatal to its validity, a situation more closely analogous to the present circumstances. *Dynamic Industries Co. v. City of Long Beach,* 159 Cal.App.2d 294, 323 P.2d 768 (1958); *Urban Transport, Inc. v. Mayor of Boston,* 373 Mass. 693, 369 N.E.2d 1135 (1977). Although we do not disagree with the conclusions these courts reached upon the facts given, further examination of the present controversy indicates that a similar result here would be incorrect.

The cases to which we have just alluded demonstrate that a mayor's signature on a municipal contract is essential to the validity of the document when it is required by law. They do not, however,

address the question of whether the actual signing of the instrument is a discretionary or a ministerial act. Providence & Worcester argues, and the trial justice agreed, that the mayor has the authority to reject the contract by withholding his signature. According to Blue Ribbon, however, the mayor was required to exercise his discretion in the matter at the time he approved the resolution that authorized the execution of the lease. Blue Ribbon has consistently maintained that the actual signing and execution of the document which is required by the Providence Code of Ordinances is a ministerial action that could be compelled by mandamus.[1] An interpretation of the relevant statutes and applicable case law leads this court to the conclusion that Blue Ribbon's conception of the legal effect of Resolution No. 1 is correct.

Section 2.3 of the Charter Laws of the City of Providence vests legislative power of the municipality in the city council. Since the conveyance of property is generally considered a legislative act, *Port Authority of Allegheny County v. Flaherty*, 6 Pa. Commw. 135, 293 A.2d 152 (1972); 10 McQuillin, *Municipal Corporations* § 28.44b (3d ed. 1981), control over the disposition of municipal property belongs in the hands of the city council. General Laws 1956 (1980 Reenactment) § 45–2–5 reinforces this conclusion by explicitly granting to any town or city council, in addition to power granted by charter, the authority to "sell, lease, convey or use * * * any lands or properties owned by said city or town * * * whenever, in the opinion of said city or town council, said lands or properties have become unsuitable [for public purposes]."

In enacting this statute, the Legislature intended to confer upon city and town councils a broad base of authority. *Valley View Tenant's Association v. Doorley*, 112 R.I. 465, 312 A.2d 209 (1973). If this court were

to hold that the mayor has absolute discretion to defeat the council's conveyance by refusing to execute an instrument, the council's authority in this area would be greatly diminished. Such a result would thwart the intended distribution of powers in city government.

*State ex rel. Historical Society v. Carroll*, 261 Wis. 6, 51 N.W.2d 723 (1952), deals with a provision in the Wisconsin statute, somewhat similar to § 45–2–5, which gives the council "management and control of the city property." *Id.* at 18, 51 N.W.2d at 729 (citing Wis.Stat. 62.11(5) (1957)). This statute led the court to reject the defendant-mayor's contention that he had discretionary power to refuse to execute a deed in favor of the plaintiff. The court reasoned as follows: "The contract having been within the power of the city to make, all discretion with respect to the propriety thereof having been exercised by the proper representatives of the city, the only thing remaining is the ministerial act." *Id.* at 22, 51 N.W.2d at 731. The court issued a writ of mandamus compelling the mayor's signature.

Providence & Worcester argues that because the resolution merely "authorized" the mayor to execute the lease extension, the act was permissible, not mandatory. Although an authorization implies permission to act, as applied to public officers, it is frequently construed as imposing an imperative duty. *Municipal Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 390 N.E.2d 1143, 417 N.Y.S.2d 218 (1979); 10 McQuillin, *Municipal Corporations* § 29.23 (3d ed. 1981). When the authorization refers to a conveyance of property, it gives rise to a ministerial duty on the part of the official designated to act to execute the instrument. 10 McQuillin, § 28.44b at 138.

---

1. The standard for issuance of a writ of mandamus is well settled. "[R]elief will be granted under a complaint for mandamus 'only where the [plaintiffs] have a clear legal right to have the act done which is sought * * * and where the [defendants] have a ministerial, legal duty to perform such act without discretion to refuse.'" *Warwick School Committee v. Gibbons*, R.I., 410 A.2d 1354, 1357 (1980) (quoting *Gormally v. Cannon*, 119 R.I. 771, 776, 383 A.2d 582, 585 (1978)).

The above interpretation finds further support in the wording of § 2–21 of the Providence Code of Ordinances. This section states that written instruments *shall* be signed and executed by the mayor. If a discretionary function were meant to be imposed, the ordinance would presumably so designate by use of a term implying a judgmental function. The word "shall" signifies that the mayor has a duty to execute written instruments. *Municipal Consultants & Publishers, Inc. v. Town of Ramapo,* 47 N.Y.2d 144, 390 N.E.2d 1143, 417 N.Y. S.2d 218 (1979).

An examination of the delegation of powers contained in the Providence Charter Laws confirms Blue Ribbon's position. Section 3.18 of those laws discusses the process by which the council's enactments become effective. Once a resolution or ordinance is adopted by the council, it is submitted to the mayor for his approval. If he rejects the measure, the council may reconsider it and, upon a two-thirds vote, override the mayor's veto. The mayor's discretionary power, under the terms of Providence Charter Laws § 3.7(h), is "subject in all cases to the power of the council to pass the same over his veto." Were the mayor again given discretion to refuse to execute and enforce the council's will, the above section would be rendered virtually meaningless.

Similar reasoning was advanced by the court in *Port Authority of Allegheny County v. Flaherty,* 6 Pa.Commw. 135, 293 A.2d 152 (1972), in response to the defendant-mayor's argument that he possessed the power to choose not to execute a deed authorized by the city council. The court, in holding that the action was "purely ministerial," explained: "To hold otherwise would confer upon the mayor, in addition to his statutory veto power the power to render every councilmanic action requiring his signature nugatory and indeed, as this lawsuit demonstrates, would confer on him a further and conclusive power to defeat programs of which he disapproves but with which the council desires to proceed." *Id.* at 144, 293 A.2d at 157.

In concluding that the mayor had a ministerial duty to execute the lease, we are not unmindful of the cases cited by P & W, particularly its special emphasis on *Urban Transport Inc. v. Mayor of Boston,* 373 Mass. 693, 369 N.E.2d 1135 (1977), in which the court ruled that the mayor's signature on a school-bus contract could not be compelled by mandamus. The mayor's approval of the contract rested within his sound discretion. We do not quarrel with the result reached in this case but would point out that the statute in question called for the written *approval* of the mayor on contracts made by any department of the city of Boston. Stat.1890, ch. 418, § 6, as amended through Stat.1955, ch. 60, § 1. In this context, the word "approval" implies that the mayor may withhold his signature if he does not believe the transaction to be in the best interests of the municipality. He may therefore, in his discretion, refrain from signing the contract, thus invalidating its existence. In describing the Providence mayor's function in signing contracts, Providence Code of Ordinances § 2–21 does not use the term "approval" but states that he "shall" sign the documents. Whereas the former describes discretionary power, the latter implies a ministerial duty.

Other cases cited by P & W encompass situations in which, in addition to the failure of the city executive to sign the contract or deed, another flaw was present. In these cases, courts could not carry out the will of the council merely by compelling a signature. *Dynamic Industries Co. v. City of Long Beach,* 159 Cal.App.2d 294, 323 P.2d 768 (1958) (terms of contract never defined or approved by city attorney or city council); *Samuel v. Borough of South Plainfield,* 136 N.J.L. 187, 54 A.2d 717 (1947) (no appropriation provided for expenditure of funds that contract called for).

Providence & Worcester takes the position that Blue Ribbon's failure to file a timely mandamus action precludes a remedy in their favor. Although Blue Ribbon neglected to request this relief explicitly, its answer to plaintiff's second amended com-

plaint included a request for specific performance. A proceeding in mandamus is treated as a civil action in which equitable relief is sought. *Canario v. Department of Natural Resources,* R.I., 412 A.2d 225 (1980); *Rosen v. Restrepo,* 119 R.I. 398, 380 A.2d 960 (1977). Since this court will "look to substance, not labels," *Sarni v. Meloccaro,* 113 R.I. 630, 636, 324 A.2d 648, 651 (1974), we see little or no difficulty in treating Blue Ribbon's request for specific performance as an action to compel execution and delivery of the lease extension.

Blue Ribbon's difficulty, however, is that it seeks to enforce this lease, not against the city, but against P & W. There are situations in which courts have ordered specific performance of unexecuted municipal contracts. *Peejay Corp. v. City of Newark,* 136 N.J.Eq. 31, 39 A.2d 873 (1944); *Municipal Consultants & Publishers, Inc. v. Town of Ramapo,* 47 N.Y.2d 144, 390 N.E.2d 1143, 417 N.Y.S.2d 218 (1979). In these cases courts compel the original parties to perform their obligations under a contract. In the present case, Blue Ribbon seeks to charge the grantee of property with the responsibility to carry out an obligation entered into by its grantor. This court's willingness to do so depends upon whether P & W knew of the commitment when it took delivery of the deed.

 General Laws 1956 (1969 Reenactment) § 34–11–1 provides that any conveyance of lands, tenements, or hereditaments for any term longer than one year is void unless it is in writing, delivered, and recorded. The conveyance is valid and binding, however, against those taking the property with notice of the prior transfer, even though it is not acknowledged or recorded. If Blue Ribbon failed to record the lease prior to P & W's receipt of the quitclaim deed, that instrument is unenforceable against P & W unless that company was aware of Blue Ribbon's claim to the property.

Blue Ribbon does not dispute its failure to record the lease extension in a timely fashion. In its brief, Blue Ribbon states that a certified copy of Resolution No. 1 was recorded some two months subsequent to P & W's recording of its deed. Undaunted by this time frame, Blue Ribbon argues that P & W had actual notice of the city council resolution authorizing the lease and therefore of its agreement with the city. The trial justice resolved this issue against Blue Ribbon and in favor of P & W. The trial justice found, as a fact, that P & W did not know of either the lease extension or the existence of Resolution No. 1 when it accepted the city's quitclaim deed.

In support of the argument that the trial justice erred in this finding, Blue Ribbon points to two aspects of the recorded testimony. First, it states that the court relied solely upon the testimony of the secretary and general counsel of P & W, a witness who Blue Ribbon claims was biased and whose testimony was incredible. In addition, Blue Ribbon cites the testimony of the city clerk who detailed the procedure for posting resolutions passed by the city council. According to Blue Ribbon, it would have been impossible for P & W, which was interested in the passage of Resolution No. 275, to have been ignorant of Resolution No. 1.

 Blue Ribbon also directs our attention to the testimony of an attorney who was Providence's city solicitor during the period negotiations were being conducted by the city and P & W. This witness told the trial justice that he "assumed" that P & W or its representative knew of Resolution No. 1. He also stated that "maybe" P & W's secretary and general counsel was present at a meeting in which a discussion took place about the impact that the lease extension would have upon the future development of the "Capital Center Project."[2]

---

**2.** The Capital Center Project is an ambitious plan to revitalize an area of downtown Providence, surrounding the State House, spanning approximately sixty acres. It is expected that the project will not be completed for at least twenty years. Within the project area lies a portion of the property involved in this litiga-

Blue Ribbon maintains that the trial justice's refusal to accept this testimony constitutes clear error. With this we cannot agree. Weighing of evidence and assessing the credibility of witnesses are functions of the trial justice. *Bengtson v. Hines,* R.I., 457 A.2d 247, 251 (1983).

Consequently, we see no reason to disturb the lower court's finding that P & W had no notice of the lease agreement between the city of Providence and Blue Ribbon. Thus, under the terms of § 34–11–1, while the lease extension would have been binding against the city, it may not be enforced against P & W as a bona fide purchaser. Our findings in this regard are without prejudice to the right of Blue Ribbon to seek monetary damages from the city.

Blue Ribbon's appeal is denied and dismissed. So much of the judgment appealed from which would bar Blue Ribbon's right to seek monetary damages from the city, specifically paragraphs 1 and 2, are hereby vacated; and the case is remanded to Superior Court with direction to enter a judgment in accordance with this opinion.

tion, thus the concern of the Providence city solicitor with Blue Ribbon's lease extension.