[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This action arises out of an alleged breach of a lease agreement entered into between the plaintiff, Blue Ribbon Beef Co., Inc. (hereinafter "Blue Ribbon") and the defendant, City of Providence. Blue Ribbon seeks damages resulting therefrom.
Facts
The facts of the case are as follows. In 1970 the City of Providence leased a parcel of property at 276 Canal Street to Wilson-Sinclair Co. for a term of five years. Wilson-Sinclair also had an option to renew for an additional five years and in 1975 it exercised the option. In 1976 Blue Ribbon purchased from Wilson-Sinclair the building that existed on the property and assumed the lease that had been renewed the previous year. Facing a 1980 expiration date, Blue Ribbon began requesting an extension of the lease in July of 1978. On January 3, 1979 the city council passed Resolution No. 1, authorizing the mayor to execute a 10 year lease with two 5 year option periods. The mayor approved the resolution, but never executed the lease.
While the city was considering Blue Ribbon's extension request it was also involved in a real estate dispute with Providence Worcester Co. regarding past due taxes and property ownership. After intense negotiations the city and Providence 
Worcester agreed to a settlement in which the city agreed to release any right, title and interest it had in "the real estate in the City of Providence bounded on the north by Smith Street, on the east by Canal Street, on the south by Promenade Street, and on the west by Stillman Street and Gaspee Street." This area deeded to Providence Worcester by the city included the property that was occupied by Blue Ribbon. The deed was delivered by the city and recorded by Providence Worcester in April of 1979.
On May 8, 1980 Providence Worcester filed a complaint in District Court claiming ownership of the property at 276 Canal Street and seeking Blue Ribbon's eviction for its failure to pay rent. After being unsuccessful in District Court, Providence 
Worcester appealed to this Court, and in its amended complaint sought a declaration that Blue Ribbon derived no right, title, or interest by virtue of Resolution No. 1 and an order directing Blue Ribbon to surrender possession of 276 Canal Street and demolish the existing building as specified in the original lease. This Court found for Providence Worcester holding that even if a valid lease was created by Resolution No. 1, Providence Worcester was not bound by it since it was a bona fide purchaser without notice of the prior conveyance.
Blue Ribbon appealed this decision, and in Providence Worcester Co. v. Blue Ribbon Beef Co., Inc., 463 A.2d 1313 (R.I. 1983), (hereinafter "Blue Ribbon I") the Supreme Court held that there was no reason to disturb this Court's finding that Providence Worcester had notice of the lease agreement between the city of Providence and Blue Ribbon. In denying and dismissing Blue Ribbon's appeal the Court held that ". . . while the lease extension would have been binding against the city, it may not be enforced against Providence Worcester as a bona fide purchaser." The Court went on to hold "Our findings in this regard are without prejudice to the right of Blue Ribbon to seek monetary damages from the city." Id. at 1319.
Thereafter, Blue Ribbon filed this present action for damages on August 17, 1989. The defendant, Stephen T. Napolitano (in his official capacity as treasurer of the city of Providence) moved to dismiss, arguing that Blue Ribbon's action accrued on either January 3, 1979, the date the city council authorized the mayor to sign the lease extension, or in April of 1979 when Providence Worcester took title to the property, and therefore Blue Ribbon did not file suit within the applicable statute-of-limitations. The parties did not dispute that the applicable statute was R.I.G.L. 1956 (1985 Reenactment) § 9-1-13(a), which provided for a ten-year statute-of-limitations. This Court granted defendant's motion and plaintiff appealed. Our Supreme Court, in Blue RibbonBeef Co., Inc. v. Napolitano, 585 A.2d 67 (R.I. 1991) reversed the decision holding that ". . . Blue's action accrued for statute-of-limitation purposes on April 30, 1980, the date when Blue's lawful possession of the premises terminated under its original lease with Providence, and when the lease extension was to begin." Id. at 69.
The next action taken in this case was a motion by plaintiff for partial summary judgment on the issue of liability. Plaintiff argued that the issue of liability regarding the lease extension had already been decided in Blue Ribbon I, leaving nothing more for determination than Blue Ribbon's monetary damages. On July 26, 1991 this Court issued a written decision denying plaintiff's motion holding that the issue resolved in Blue Ribbon I was whether a valid, enforceable lease existed between Providence 
Worcester and Blue Ribbon, and not whether the city breached its lease with Blue Ribbon. This case proceeded to trial and was heard, without a jury, on February 7, 1994 and February 10, 1994.
Discussion
This Court must decide the following issues. First, did the action taken by the city in conveying the property to Providence Worcester constitute a breach of its lease with Blue Ribbon. Second, if a breach did occur, did plaintiff take proper steps to mitigate the damages incurred. And finally, what were the type and amount of damages incurred by plaintiff.
Breach of Contract
In Thompson v. Thompson, 495 A.2d 678 (R.I. 1985), the Rhode Island Supreme Court held that ". . . to give rise to an anticipatory breach of contract the defendant's refusal to perform must have been positive and unconditional." The Court went on to hold that ". . . a conveyance of property by the promisor to another, making full performance of the contract impracticable or impossible has been held to be a repudiation."Id. at 682.
The fact that a lease contract existed in this case cannot be disputed. That issue was already decided in Blue Ribbon I. The subsequent action taken by the defendant where it conveyed the property to Providence Worcester clearly made the performance of defendant's obligations to plaintiff impossible. This certainly constitutes the type of positive and unconditional action necessary to establish the city's liability to plaintiff for breach of contract.
Mitigation
Comments (f) and (i) to the RESTATEMENT (SECOND) OF PROPERTY, Sec. 10.2 discuss mitigation of damages in cases where a landlord fails to fulfill his obligations under a lease agreement. Comment (f) states, in part:
 f. Anticipated business profits.
 .
 The mitigation of damages rule (See Comment i) is particularly applicable in relation to loss of anticipated profits for the period between the date of the landlord's default and the date when the tenant should have re-established his business operations without the impediment of the landlord's default. This re-establishment may be on the leased property itself when the tenant can and does eliminate the landlord's default or on other premises when the tenant elects to terminate the lease because of the landlord's default.
Comment (i) states:
 i. Mitigation of damages. The tenant must take reasonable steps to mitigate his losses. His recovery will be limited to the damages which would have been incurred by a tenant who took all reasonable means to mitigate his losses.
Defendant argues that plaintiff did not take reasonable steps in mitigating damages. However, the evidence in the case indicates otherwise. Plaintiff continued its business until 1983 when the building in which it was operating was razed. Business was then conducted from the home of Mr. William Rossi, (Rossi) President of Blue Ribbon, until 1987 when he discontinued the meat sales aspect of the business altogether. Rossi testified that he considered several buildings in Providence in which to relocate his business but he found them to be obsolete, unable to meet federal and state sanitary standards, or unsuitable for conducting a wholesale meat business. Defendant argued that for Rossi to testify that he has sought unsuccessfully for 12 years to find a suitable building defies credibility.
This Court is satisfied that the actions taken by plaintiff in an attempt to mitigate the losses sustained due to the city's breach were reasonable and sufficient. Plaintiff continued conducting business on the leased property as long as it possibly could. The business was then relocated to Mr. Rossi's home. An examination of the company's summary of operations shows that the company operated at a loss in years 1983, 1985, 1986, and 1987 with respect to the wholesale meat aspect of the business. The action taken at that point by Rossi in discontinuing that part of the business was clearly a reasonable one. In addition, the Court found Rossi to be a credible witness.
Damages
As noted above, the RESTATEMENT (SECOND) OF PROPERTY, Sec. 10.2 (1976) discusses damages in cases involving a breach of a lease agreement.
Section 10.2 states:
 Sec. 10.2 Damages
 If the tenant is entitled to recover damages from the landlord for his failure to fulfill his obligations under the lease, absent a valid agreement as to the measure of damages, damages may include one or more of the following items as may be appropriate so long as no double recovery is involved:
 .
 (5) if the use of the leased property contemplated by the parties is for business purposes, loss of anticipated business profits proven to a reasonable degree of certainty, which resulted from the landlord's default, and which the landlord at the time the lease was made could reasonably have foreseen would be caused by the default; . . . .
Rhode Island has consistently followed the Restatement. As recently as 1992 the Rhode Island Supreme Court reiterated the standard required to be met when seeking damages for lost profits. In Troutbrook Farm, Inc. v. DeWitt, 611 A.2d 820 (R.I. 1992), the Court held ". . . in order to recover, a plaintiff must establish with reasonable certainty the net lost profits he or she suffered as a result of the defendant's failure to perform." Id. at 824. In Smith Development Corp. v. BilowEnterprises, Inc., 308 A.2d 477 (R.I. 1973) the Supreme Court additionally held "Unquestionably, one of the ways of establishing a loss of profits is by showing the past history of a successful and profitable operation of the business." Id. at 482.
Defendant argues that plaintiff is not entitled to damages for lost profits because its claim is "speculative" and based on "unrealistic assumption." This Court is mindful that it is not dealing with a new business, but one that in fact had a past history of successful and profitable operation. Until defendant's breach of the lease agreement plaintiff exhibited yearly increases in both sales and profits. This Court believes that plaintiff has undoubtedly and amply met the "reasonable certainty" standard in establishing lost profits.
Defendant also argues that even if Blue Ribbon is entitled to damages for the period of the initial 10 year lease, its claim for damages for the two 5 year lease option periods is too speculative. Defendant directs the Court's attention to Hole v.Unity Petroleum Corporation, 131 P.2d 150 (Wash. 1942). In that case the plaintiff and defendant had entered into a one year exclusive sales and distribution agreement for defendant's petroleum products. Plaintiff also had an option to extend the contract for an additional year. The appellate court agreed with the trial court's decision denying lost profits for the option period holding that ". . . computation of damages for prospective profits beyond the term of the contract would be too speculative and doubtful . . ." Id. at 154.
Defendant's reliance on Unity Petroleum is misplaced as this Court finds plaintiff is entitled to recover lost profit damages for the option periods for the following reasons. First, in the Unity Petroleum case the court noted that "The distribution of gasoline is a highly competitive and uncertain business. Respondent would not have exercised his option to extend the life of the contract if conditions did not appear to be favorable when the time to make his election arrived." UnityPetroleum at 154. This Court believes that the business in this case, the sale of beef, while no doubt competitive, is not as highly competitive and uncertain as that of gasoline distribution. Rossi testified unequivocally that had defendant not breached the lease agreement he would have exercised both options. The Court does not doubt Rossi's testimony. Rossi is an expert in the wholesale meat industry having been involved in the business for his entire adult life. He had established a business that, until defendant's breach, showed impressive gains in both sales and profits. Finally, it should be noted that during the negotiations for the lease extension in 1979, Rossi and his attorney had requested a 20 year lease to assure that the building, which was "ideal for plaintiff's business," would be available for a long period of time. It was the defendant who insisted on an initial lease of 10 years with two 5 year option periods in order to afford itself flexibility in negotiating future rental charges.
In support of its claim for damages plaintiff has presented a compilation report prepared by Bradford Sparrow, CPA, which purports to show the amount of lost profits sustained by plaintiff as a result of defendant's breach. This report seems to be based largely on the testimony of Rossi, specifically his testimony that he hoped to reach "$7,000,000 in sales by 1986." From there a growth rate of 6% is projected. After calculating projected income from operations and investment and deducting actual net income, projected loss of net income before taxes is reached. Applying a discount rate of 12% yields a projected loss of corporation profits of $662,800. On the second day of trial Mr. Sparrow testified that certain adjustments had to be made, and he should have started his projections with year ending 1982 instead of year ending 1981.
Without conceding that plaintiff has any right to lost profit damages, defendant has submitted an analysis prepared by Frank Gesmondi, CPA, which differs significantly from the report submitted by plaintiff. The Gesmondi report projects lost profits using the year ending 1982 actual sales figure as its starting point and projects sales for year ending 1983 and beyond. The report projects future sales by applying both a quantity index and an inflationary index to the previous years' sales. The quantity index, which measures meat consumption in the United States, was obtained from the American Meat Institute. The inflation index, which measures the price of meat, was obtained form the U.S. Department of Labor. After applying these factors, calculating projected income as a percentage of projected sales, deducting actual income, and discounting, a figure of $105,814 is reached as the amount of lost profits.
In calculating lost profit damages the court must be guided by a "rational and reliable standard." Troutbrook Farm at 824. "Mathematical exactitude" is not required. See R.I. Turnpike v.Bethlehem Steel Corp., 379 A.2d 344 (R.I. 1977). This Court is not satisfied that either of the two figures submitted represents the amount of lost profits incurred in this case. Plaintiff's method of calculating lost profits on the basis of a hope that sales would reach a certain level is unsound.
Defendant's use of the sales of year ending 1982 as a starting point upon which to project future sales is flawed. Before the breach occurred, Blue Ribbon had experienced a steady increase in sales from a starting level of $514,900 in 1977 to a high of $1,842,700 in year ending June 30, 1980. The breach occurred in April of 1970. Sales for year ending June 30, 1982 sales figure, which was only $551,000, upon which to base future sales suggests that plaintiff suffered no loss in years 1981 and 1982. Defendant attempts to support its position by arguing that Rossi had testified that he was changing the nature of Blue Ribbon's business to "portion control" where the company could make more money on fewer sales. However, defendant is ignoring Rossi's testimony that the business was being "harassed" by Providence Worcester. It is also noteworthy that, at the time, Blue Ribbon was directed by an order of this Court to surrender possession of the property and demolish the existing building. This Court finds that these factors also contributed to reduce sales, and it is the Court's opinion that Blue Ribbon did suffer lost profits in 1982.
As noted above, it was suggested by plaintiff's expert that projections of lost sales should start in year ending 1982. The Court agrees with plaintiff on this point. Using the 1981 sales figure as a base, and employing the method utilized by defendant to project future sales, yields projected sales amounts ranging from $1,414,595 in year ending June 30, 1982 to $1,263,686 for the 7 month period ending January 31, 1999, which was when the lease was to expire. Using these sales figures as a basis upon which to calculate lost profits results in a figure which this Court feels more accurately reflects the loss incurred. This Court realizes that proceeding in this manner results in applying the business's highest profit margin to an increased level of sales, and it believes that this is a rational and reliable standard upon which to calculate damages in this case. Calculating projected income from operations as 4.42% of projected sales, adding projected income from investment (which both parties agreed should be $8,400 a year), and deducting actual income results in yearly projected lost income. Discounting these figures at a rate of 12% back to the time of the breach gives the present value of income. This Court finds that plaintiff suffered lost profits in the amount of $351,991 with interest as a result of the defendant's breach of the lease agreement.
Counsel shall submit an appropriate judgment Order.