**TROUTBROOK FARM, INC.**

v.

**Mary DeWITT.**

**No. 91–52–Appeal.**

Supreme Court of Rhode Island.

June 12, 1992.

William R. Grimm, Hinckley, Allen, Snyder & Comen, Mary Kathryn Miluski, Hinckley, Allen, Snyder & Comen, Providence, for plaintiff.

Lauren Jones, Jones Associates, Providence, for defendant.

## OPINION

FAY, Chief Justice.

This case comes before the Supreme Court on the appeals of both the defendant, Mary DeWitt (DeWitt), and the plaintiff, Troutbrook Farm, Inc. (Troutbrook). DeWitt appeals from the Superior Court's denial of her motion to vacate the default and from the court's award of compensatory damages to Troutbrook. Troutbrook cross-appeals from that portion of the trial justice's order that denied contempt sanctions against DeWitt. We affirm the decision of the trial justice in part and reverse in part.

DeWitt is the owner of a champion Morgan stallion named Waseeka's In Command (In Command). In 1976 DeWitt leased In Command to Troutbrook for breeding purposes. In 1982 a controversy arose between DeWitt and Troutbrook concerning the manner in which Troutbrook was managing In Command's services. DeWitt learned that as a result of In Command's reduced ability to breed naturally, Troutbrook was utilizing artificial insemination in order to breed the stallion. DeWitt also believed that Troutbrook had not been paying her the share of breeding fees to which she was entitled pursuant to their lease agreement. Fearing that Troutbrook was causing harm to In Command, DeWitt attempted to terminate her lease with Troutbrook. DeWitt also brought suit in Superior Court, seeking the return of In Command and the payment of money due her pursuant to the lease agreement.

During the pendency of this action DeWitt, pursuant to a letter agreement, transferred In Command to Cornell University in order to have the stallion examined by a veterinary physician. The agreement required DeWitt to return In Command to Troutbrook upon completion of the examination. However, DeWitt did not return the stallion to Troutbrook; instead she placed In Command at Fiddler's Green Farm (Fiddler's Green).

Although DeWitt's action against Troutbrook was pending in the Superior Court, in January 1984 Troutbrook filed a separate action seeking injunctive relief, arguing that DeWitt's failure to return In Command violated the parties' letter agreement. The Superior Court issued an ex parte temporary restraining order requiring DeWitt to return In Command to Troutbrook. The restraining order was superseded by a preliminary injunction after a hearing at which DeWitt did not appear. Troutbrook then amended its complaint, alleging harm to its business reputation and loss of income as a result of DeWitt's failure to return In Command. The amended complaint sought damages in the amount of $300,000.

On March 28, 1984, a Superior Court justice adjudged DeWitt in contempt of the restraining order, imposed a $175–per–day fine, and enjoined DeWitt from prosecuting the civil action she had filed until she complied with the court's order. When DeWitt failed to file an answer to Troutbrook's complaint, Troutbrook successfully moved for entry of default. After a hearing on the damages, the trial justice entered a default judgment in the amount of $662,300. With the addition of interest and costs this judgment totaled $721,955, and execution was issued in that amount.

Thereafter, pursuant to Rule 60(b) of the Superior Court Rules of Civil Procedure, DeWitt moved to vacate the default judgment on the ground of excusable neglect. In support of this motion, DeWitt filed an affidavit asserting that she had been confused by the documents served upon her and believed that they were all part of the original action. After a hearing the trial justice concluded that DeWitt had not established excusable neglect and therefore denied DeWitt's motion. DeWitt appealed

from the denial of her motion to vacate the default judgment.

In *Troutbrook Farm, Inc. v. DeWitt*, 540 A.2d 18 (R.I.1988) (*Troutbrook I*), this court affirmed the trial justice's judgment in part and reversed in part. We concluded that " '[a] judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment.' " *Id.* at 20. The judgment entered by the trial justice was in excess of the $300,000 damages sought by Troutbrook in its amended complaint. Therefore, we remanded the case for a reassessment of damages within the limit set forth in Troutbrook's amended complaint. We did not disturb the trial justice's determination that DeWitt had failed to establish excusable neglect. We noted that the trial justice could impose sanctions upon DeWitt "for her failure to obey prior orders of the Superior Court. However, this may be done as part of the reassessment of damages upon remand." *Id.* at 20–21.

Upon remand DeWitt filed both a motion to set aside the default and a motion for relief from the contempt order. The trial justice held evidentiary hearings to redetermine damages. At the hearing Troutbrook presented its case through several affidavits as well as the live testimony of James Anderson (Anderson) and Leo Picard (Picard). DeWitt did not appear or offer evidence; however, her attorney cross-examined Anderson and Picard.

Picard, president of Troutbrook Farm since 1968, testified that he had been in the business of breeding Morgan horses for over eighteen years. He stated that In Command was a dominant show horse and was considered to be the premier sire of the Morgan horse breed.[1] The records kept by Troutbrook indicate that during the eight years In Command was at Troutbrook Farm, the stallion was bred to a total of 186 mares.

Picard suggested that as a result of In Command's preeminence as a Morgan sire, Troutbrook lost substantial earnings when DeWitt did not return the stallion. Picard testified concerning the stud fees that Troutbrook intended to charge between 1984 and 1987.[2] Troutbrook had charged $2,500 per mare in 1983 and planned to charge $5,000 in 1984 and 1985 and $6,500 in 1986 and 1987. Pursuant to the lease agreement, DeWitt and Troutbrook would equally divide the total amount of stud fees earned each year. Picard stated that the outside mares that were bred with In Command stayed at the farm an average of 102 days. Picard also asserted that Troutbrook would have charged mare-care fees of $10 per day in 1984 and 1985 and $11 per day in 1986 and 1987.[3] Troutbrook projected that during the years 1984 to 1987, it would have leased between seven and twelve mares each year to breed with In Command. Pursuant to the lease agreements, Troutbrook would have been entitled to retain the first foal produced by each leased mare. In addition Troutbrook would have one mare leased continuously from 1984 to 1987. The foals produced by this mare would have solely belonged to Troutbrook. Troutbrook asserted that it could have produced additional income from selling these foals.[4] In Picard's opinion the average minimum value of each foal sired by In Command would have been $25,000. Picard asserted that as a result of DeWitt's failure to return In Command, Troutbrook

---

1. In Command had a number-one-living-sire rating in Page's Sire Rating, a rating that is commonly relied upon by the American Morgan Horse Association and its members.

2. Stud fees are fees charged by Troutbrook to breed In Command with "outside mares" who are not owned by Troutbrook and consist of a booking fee, a departure fee, and a foal fee.

3. Mare-care fees are those charged for stabling, bedding, and feeding the mares as well as cleaning stalls. According to Picard, of the $10

charged per day in 1984 and 1985, $5 was profit. Six dollars was profit of the $11–per–day fee Troutbrook was going to charge in 1986 and 1987.

4. Troutbrook could have generated foal income from (1) the sale of the foals immediately at birth or after they had matured, (2) the stud fees generated by the foals after they had matured, and/or (3) the sale of subsequent foals that could have been produced by breeding the new foals after their maturity.

sustained a total of $420,640 in damages.[5] In computing its damages, Troutbrook utilized the actual settling rate accomplished by In Command while at Fiddler's Green during the years 1984 through 1987.[6]

Troutbrook submitted an affidavit by Anderson, the owner and operator of a training stable in Massachusetts. On cross-examination Anderson testified that he had been involved in the sale of sixteen of In Command's offspring. Attached to his affidavit was an exhibit listing the sales of In Command's offspring in which Anderson had been personally involved. The selling prices of the offspring ranged from $4,500 to $130,000, with an average price in excess of $29,000. However, Anderson indicated that these figures were sales prices and did not take into account any costs incurred in selling the offspring.

The trial justice, relying upon the original trial justice's determination that DeWitt had not proved excusable neglect, denied DeWitt's motion to set aside the default. The trial justice also disagreed with DeWitt's assertion that Troutbrook's damage estimate was based upon speculation and lacked evidentiary support. He found "the historical breeding record of the stallion to be a rational and reliable standard to calculate Troutbrook's damages." The trial justice concluded that it was reasonable to believe that In Command would have bred an average of twenty mares per year between 1984 and 1987, resulting in a net stud-fee loss to Troutbrook of $75,750. He concluded that Troutbrook had lost $19,890 in mare-care profits. However, the trial justice rejected Troutbrook's valuation of the selling price for In Command's off-

spring. He determined that $4,500 was a more reasonable value per foal for assessing foal profits. Using $4,500 per foal, the trial justice determined that Troutbrook was unable to capitalize on lost-foal profits of at least $58,500. According to the trial justice, Troutbrook had established damages in the amount of $154,140. As a result of the amount of damages awarded, the trial justice denied Troutbrook's motion for assessment of contempt sanctions.

DeWitt appealed from this decision, arguing that the trial justice had abused his discretion in denying her motion to set aside the default. DeWitt contends that our decision in *Troutbrook I* essentially erased the default judgment, and therefore, on remand "the procedural posture of the case * * * was returned to that point in time in which a default had been entered by plaintiff pursuant to Rule 55(a) of the Superior Court Rules of Civil Procedure." DeWitt argues that the question of whether to set aside a default under Rule 55(c) requires a separate and distinct legal analysis from that required for determining whether to grant relief from a default judgment under Rule 60(b).[7] DeWitt contends that on remand it would have been proper for the trial justice to grant her motion to set aside the default for good cause pursuant to Rule 55(c). We disagree with DeWitt's arguments.

We have often held "that a motion to vacate a default judgment is within the discretion of the trial justice before whom the motion is brought." *Phoenix Construction Co. v. Hanson*, 491 A.2d 330, 332 (R.I.1985). Absent a showing of abuse of discretion, we shall uphold the decision

---

5. Troutbrook claims its damages were $180,995 in 1984, $122,965 in 1985, $99,396 in 1986, and $17,284 in 1987. The total-damages figure is a compilation of the lost stud fees, mare-care profits, and foalsale profits. Troutbrook estimated that as a result of DeWitt's failure to return In Command, it lost $75,750 in stud fees, $19,890 in mare-care profits, and $325,000 in foal-sale profits.

6. The settling rate is a percentage calculated by dividing the number of foals produced in a year by the number of mares bred in a year. The settling rate indicates the percentage of mares impregnated during the year.

7. Rule 55(c) of the Superior Court Rules of Civil Procedure permits a trial justice to set aside a default "[f]or good cause shown * * * and, if a judgment by default has been entered, [the court] may likewise set it aside in accordance with Rule 60(b)." A default judgment will be removed when the defaulting party establishes that his or her "neglect was occasioned by some extenuating circumstances of sufficient significance to render it excusable." *King v. Brown*, 103 R.I. 154, 157, 235 A.2d 874, 875 (1967); *see also* Super.R.Civ.P. 60(b).

of the trial justice. In *Troutbrook I* we stated that "this court will not disturb [the trial justice's] determination in respect to the removal of the default." 540 A.2d at 20. We remanded the case for a reassessment of the damages.

■ Our decision in *Troutbrook I* upheld that portion of the trial justice's decision that denied DeWitt's motion to vacate the default. Therefore, on remand the trial justice did not have the authority to reconsider the removal of the default, nor was he empowered to consider DeWitt's arguments on the underlying merits of her case. *Troutbrook I* merely set aside the amount of damages assessed by the trial justice; it did not vacate the default judgment. Because the trial justice on remand only had the power to reassess the amount of damages, we conclude that he was correct in denying DeWitt's motion to set aside the default.

DeWitt contends that Troutbrook did not sustain any damages because she allegedly terminated their lease agreement. She argues that the trial justice failed to consider "whether the effectiveness of an option of one party to terminate a lease is dependent upon the existence of a similar option on the part of the other party." We need not address the argument asserted by DeWitt concerning the lease agreement because the default judgment and Troutbrook's damages flow from DeWitt's failure to return In Command pursuant to the terms of the letter agreement entered into by the parties, not the lease agreement.

DeWitt also asserts that the trial justice erred by awarding compensatory damages to Troutbrook for lost profits because Troutbrook failed to meet its burden of establishing its net lost profits and because Troutbrook's claim of damages is too uncertain and speculative to support the trial justice's award of damages.

■ We have recognized that lost profits are a proper element of damages in cases in which a business has been interrupted. *Abbey Medical/Abbey Rents, Inc. v. Mignacca*, 471 A.2d 189, 195 (R.I.1984). However, in order to recover, a plaintiff must establish with reasonable certainty the net lost profits he or she suffered as a result of the defendant's failure to perform. *National Chain Co. v. Campbell*, 487 A.2d 132, 135 (R.I.1985). In order to meet this burden, a plaintiff needs to prove lost revenue as well as costs and expenses involved in the generation of that revenue.

The trial justice determined that Troutbrook had met its burden of establishing its damages, finding the historical breeding record of In Command to be a rational and reliable standard with which to calculate Troutbrook's damages. He found that Troutbrook had proven lost stud fees in the amount of $75,750 and lost mare-care profits of $19,890 with reasonable certainty. However, the trial justice concluded that Troutbrook had not adequately established its lost foal profits and therefore reduced the amount sought by Troutbrook to $58,500.

■ Troutbrook had the burden of proving the amount of net profits it lost as a result of DeWitt's failure to return In Command to Troutbrook. Although Troutbrook did produce evidence in the form of exhibits concerning its stud-fee proceeds, mare-care revenue, and foalsale income, we believe that Troutbrook failed to meet its burden of proving its net lost profit. The financial data introduced by Troutbrook appears solely to reflect the anticipated revenue Troutbrook would have earned had DeWitt returned In Command. No evidence was introduced with regard to the ordinary expenses and costs it incurs in breeding In Command.

In order for the trial justice properly to award damages to compensate Troutbrook for its net lost profits, Troutbrook needed to provide the trial justice with information on the expenses it would have incurred in the operation of its stud farm had In Command been returned. Although we do not profess to be experts in the stud-farm business, we believe that there must be a great deal of expense involved in running this type of business, especially since Troutbrook registered a net profit in only two of the seven years of operation during which In Command was with Troutbrook. For

example, the trial justice was not presented with evidence concerning the cost of stabling and feeding In Command or the expense of the artificial-insemination procedure used to breed the stallion. Although Troutbrook contended that it would lease a number of mares each year to breed with In Command, Troutbrook did not offer evidence regarding the cost of stabling and feeding these mares. Troutbrook's estimation of its damages also does not appear to take into consideration the fact that pursuant to their lease agreement, DeWitt was entitled to one-half of all fees collected from breeding In Command to outside mares. Because Troutbrook failed to provide evidence concerning the expenses and costs associated with its business, the trial justice could not properly award damages. We therefore set aside the trial justice's determination of damages and remand for a reconsideration of Troutbrook's net lost profits.

Troutbrook argues that the trial justice erred by vacating the contempt order that required DeWitt to return In Command and by improperly awarding damages in lieu of, rather than in addition to, sanctions. We disagree with Troutbrook's contentions.

■ We have held that civil contempt "is remedial and designed to reimburse complainants for the wrong done as a result of the noncompliance with a valid order of the court." *Nelson v. Progressive Realty Corp.*, 81 R.I. 445, 450, 104 A.2d 241, 243 (1954). A court may use contempt sanctions to coerce a defendant into complying with a court order and/or to compensate the complainants for losses caused by a defendant's failure to comply with the court's order. *Ventures Management Co. v. Geruso*, 434 A.2d 252, 254 (R.I.1981); *School Committee of Pawtucket v. Pawtucket Teachers Alliance*, 101 R.I. 243, 254–55, 221 A.2d 806, 813 (1966).

In February 1984 the Superior Court issued an injunction that required DeWitt to return In Command to Troutbrook. As a result of her failure to return In Command, the trial justice found DeWitt to be in contempt of the injunction and imposed a fine in the amount of $175 per day until such time as she complied with the court's order. In *Troutbrook I* we stated that it was within the trial justice's authority on remand to impose sanctions upon DeWitt, but we suggested that this could "be done as part of the reassessment of damages upon remand."

■ On remand the trial justice did not impose additional sanctions on DeWitt. Because of In Command's complete inability to breed and Troutbrook's financial problems, after 1987 Troutbrook no longer sought the return of the stallion. Therefore, any coercive element of the contempt order had been eliminated. Troutbrook will be fully reimbursed for any loss it suffered as a result of DeWitt's failure to comply with the court's order to return In Command by the trial justice's award of damages. Thus the trial justice satisfied the compensatory element of the contempt order. In *Troutbrook I* we determined that it was within the trial justice's discretion to impose sanctions upon DeWitt. In light of his award of damages, we conclude that the trial justice's decision not to impose further sanctions is not an abuse of his discretion.

Consequently we conclude that Troutbrook did not meet its burden of proving its net lost profits with reasonable certainty. DeWitt's appeal is sustained. Troutbrook's appeal is denied and dismissed. The judgment appealed from is affirmed in part and reversed in part. The papers of this case are remanded to the Superior Court for further proceedings consistent with this opinion.