John LONG

v.

ATLANTIC PBS, INC., et al.

No. 94–685–Appeal.

Supreme Court of Rhode Island.

July 18, 1996.

John D. Deacon, Jr., Providence, for Plaintiff.

Kris Macaruso Marotti, Anthony S. Buglio, Warwick, for Defendants.

## OPINION

FLANDERS, Justice.

This case provides yet another illustration of why, as Neil Sedaka once crooned, "Breaking up is hard to do"[1]—even in business relationships. Two former business associates and the corporation that once employed them, all now claiming to be "more sinned against than sinning,"[2] appeal from judgments entered by the Superior Court after a jury gave at least some credence to both sides' claims and counterclaims when it returned a verdict in favor of Atlantic PBS, Inc. (Atlantic) on its breach-of-fiduciary-duty claims and in favor of John Long (Long) on his breach-of-promise-to-transfer-stock claim. For the reasons set forth below, we affirm all aspects of the judgments except one: we believe that the damages award against Long should have been capped at $4,767.75.

### Facts

In March 1989, Atlantic fired the first volley in this legal campaign when it sued Long, a former corporate officer and employee, for, among other claims, breaching his fiduciary duties by diverting business to another company he owned while still employed at Atlantic. Long then counterattacked by suing Atlantic and its owner, Paul Sobolewski (Sobolewski), for failing, inter alia, to provide him with 10 percent of Atlantic's stock as he had been promised.

In 1982, Long began working for Atlantic, a corporation wholly owned by Sobolewski. Atlantic sold and installed insulation for commercial and residential buildings and also performed construction and other site work. The first few years of the parties' relationship proved fruitful. Working together, Sobolewski and Long not only helped Atlantic's business to prosper but also became close friends in the bargain. Although Sobolewski named Long a vice president and a director of Atlantic in 1983, Long balked at signing a noncompetition agreement with Atlantic—de-

---

1. Neil Sedaka and Howard Greenfield, *Breaking up is Hard to Do* (RCA Records 1962).

2. William Shakespeare, *The History of King Lear*, scene 10, line 60.

spite Sobolewski's exhortations that he do so. Nonetheless, Sobolewski agreed to make Long a 10–percent shareholder in Atlantic by promising to give him a 2–percent stock interest in Atlantic each year for a period of five years.

By 1987 the insulation between these co-venturers' ambitions had begun to wear thin. Long came to believe that he could no longer trust Sobolewski and resolved to leave Atlantic. In June of that year, Robert Houghton, another Atlantic employee who owned a small construction company, asked Long if he wanted to go into business with him. (Sobolewski knew about Houghton's moon-lighting.) Long accepted this offer, and in October 1987 he became a 50–percent stockholder in Houghton's construction company, which they renamed R.J. Loughton, Inc. (R.J.).

Long left Atlantic later that same month. Sobolewski, however, convinced Houghton to keep working at Atlantic by giving him Long's old job. Undeterred, Long decided to run R.J. by himself.

However, before leaving Atlantic in October of 1987, Long helped R.J. acquire a $17,000 contract to paint a school in Mansfield, Massachusetts. Long also used his contacts with Morton Building Company (Morton), a corporation that had done business with Atlantic, to secure a $14,785 site-preparation and inspection contract for R.J. Except for Long's diversion of this work to R.J., these contracts were corporate opportunities that Atlantic could have pursued to its benefit. To prevent Sobolewski and Atlantic from learning about these predeparture contracts he had obtained for R.J., Long kept them under his hat. And before leaving Atlantic, Long tried to persuade several Atlantic employees to join him at R.J.

Moreover, much to Sobolewski's and Atlantic's dismay, R.J. and Morton had other profitable business dealings after Long left Atlantic. As a result, Sobolewski blamed Long for stealing Morton away from Atlantic as a customer and claimed that, but for Long's

having breached his fiduciary duties to Atlantic, Atlantic would have secured this postdeparture business that Long had obtained for R.J. However, Morton's office manager, Geoffrey Brunson (Brunson), testified that Morton eventually stopped doing business with Atlantic not because of any solicitation of Morton by Long but because Morton was dissatisfied with Atlantic's product and Sobolewski's peevishness.

In response to Long's defection, Sobolewski reneged on his promise to transfer a portion of Atlantic's stock to Long and purported to cancel whatever stock interest Long was supposed to have acquired already at Atlantic. Long later filed a stockholder's request under G.L.1956 § 7–1.1–46 to inspect Atlantic's books and records. Sobolewski spurned this demand, and these suits followed.

At trial the jury agreed with Atlantic that Long had breached his fiduciary duty of loyalty to the company, and it awarded Atlantic damages against Long in the amount of $18,902 on this claim. The trial justice denied Long's new-trial and directed-verdict motions and entered judgment for Atlantic on its breach-of-fiduciary-duty charge.

■ But the jury also found in favor of Long on his claim that Sobolewski had violated their 1984 agreement by having failed to deliver to him the appropriate number of shares of Atlantic stock that Sobolewski had promised to transfer to him. On the basis of expert testimony these shares were valued at $37,350. The jury awarded Long $37,350 in damages and also imposed a statutory penalty of $3,735 on Sobolewski for having failed to produce Atlantic's corporate records as requested by Long. See § 7–1.1–46 (imposing a penalty of 10 percent of the value of the shares owned by a requesting shareholder for any corporate officer's or agent's wrongful refusal to permit examination of the corporation's books and records). After denying Atlantic's and Sobolewski's new-trial motion, the court entered judgment on the jury's verdict. These appeals ensued.[3]

3. Parenthetically we note that after these appeals were docketed, Long filed a motion to vacate the judgment against him on the basis of newly dis-

covered evidence. See Super. R. Civ. P. 60(b). However, the motion was heard and granted without having first sought and obtained a re-

## Analysis

### A. Long's Appeal

Long contends on appeal that he was entitled to a directed verdict on the breach-of-fiduciary-duty charge for all damage claims in excess of $1,096.62.

 The standard under which we review the denial of Long's directed-verdict motion is a familiar one.[4] The proof and the inferences reasonably to be drawn therefrom must be assayed in the light most favorable to the nonmovants, free from any questions of credibility, *e.g.*, *Lutz Engineering Co. v. Industrial Louvers, Inc.*, 585 A.2d 631, 635 (R.I.1991), but without the benefit of any inferences based on conjecture, speculation, or surmise. *See Souza v. Narragansett Council, Boy Scouts of America*, 488 A.2d 713, 715 (R.I.1985). A verdict should be directed when the evidence permits only one legitimate conclusion in regard to the outcome. *E.g.*, *Kenney Manufacturing Co. v. Starkweather & Shepley*, 643 A.2d 203, 206 (R.I.1994). Because there was no evidence introduced to support any damages award to Atlantic above $4,767.75, we believe Long cleared this hurdle.

 The basic precondition for the recovery of lost profits is that such a loss be established with "reasonable certainty." *Troutbrook Farm, Inc. v. DeWitt*, 611 A.2d 820, 824 (R.I.1992). Although mathematical precision is not required, the jury should be provided with some rational model of how the lost profits occurred and on what basis they have been computed. *Abbey Medical/Abbey Rents, Inc. v. Mignacca*, 471 A.2d 189, 195 (R.I.1984). And the bottom line should be the injured party's *net* lost profits after expenses are deducted and before taxes are calculated. *See id.; Troutbrook Farm, Inc.*, 611 A.2d at 824.

Although Atlantic prepared a gallimaufry of theories in support of its damage claims for breach of fiduciary duty, this concoction boils down to charges involving three types of alleged misconduct by Long: (1) contracts that Long diverted to R.J. before Long left Atlantic, (2) business obtained by R.J. after Long left Atlantic, and (3) Long's attempts to entice three Atlantic employees to join his new company. In fine, we believe the court below should have directed a verdict in Long's favor regarding the damage claims attributable to the predeparture contracts for any damages sought over $4,767.75, to the postdeparture contracts, and to Long's solicitation of Atlantic's employees.

#### 1. Predeparture contract claims

The amount of lost-profit damages Atlantic can recover on the contracts Long procured for R.J. before leaving Atlantic is a function of two variables: (1) the dollar value of the contracts diverted from Atlantic to R.J. and (2) Atlantic's profit margins if it had obtained these contracts. Thus, pursuant to one of the contracts Long purloined from Atlantic, R.J. painted a school in 1987 for about $17,-000. Because Atlantic's profit margin for that year was no greater than 15 percent,[5] Atlantic could have realized no more than $2,550 if it had obtained and performed the painting contract instead of R.J. Applying

---

mand from this court to do so. That action was error. Once an appeal is docketed here, a party is precluded from having a Rule 60 motion to vacate considered by the Superior Court without first seeking and obtaining a remand from this court because the Superior Court no longer has jurisdiction to pass on the matter. *See Nichola v. John Hancock Mutual Life Insurance Co.*, 471 A.2d 945, 947 (R.I.1984). Accordingly we treat the granting of that motion as a nullity.

**4.** In 1995 the Superior Court Rules of Civil Procedure were revised, and among other changes the amended rules abandon former Rule 50's "directed verdict" nomenclature in favor of a new appellation—"judgment as a matter of law." However, this name change does not affect the applicable standard of review. *See* Super. R. Civ. P. 50 advisory committee's notes (1995 Supp.).

**5.** Although Sobolewski initially testified at trial that Atlantic's 1987 profit margin ran anywhere from 12 to 15 percent, Long tried to use Atlantic's records to show that in his estimation this profit-margin figure was actually closer to 6.9 percent. Because the trial justice is required on a directed-verdict motion to view the record in the light most favorable to the nonmoving party (Sobolewski), *see Lutz Engineering Co. v. Industrial Louvers, Inc.*, 585 A.2d 631, 635 (R.I.1991), we are compelled to accept the 15 percent number as establishing the high water mark for any recovery based on this theory.

this same maximum net-profit margin to the $14,785 inspection contract that Long obtained for R.J. produces a best-case lost-net-profit figure of $2,217.75 for Atlantic. Thus, Atlantic's total lost profits on these two predeparture contracts is $4,767.75.

■ Long argues that whatever lost-profit amounts are involved should be reduced by 50 percent because that was the extent of Long's interest in R.J. But the measure of damages is the loss to Atlantic, *Psaty & Fuhrman, Inc. v. The Housing Authority of Providence*, 76 R.I. 87, 98, 68 A.2d 32, 38 (1949), not the gain to Long. On the basis of the foregoing, Atlantic's damage claims for Long's predeparture breaches of loyalty should have been capped at $4,767.75. There was no basis in the record for a reasonable juror to award greater damages. Thus, the trial justice should have directed a verdict in Long's favor for any predeparture lost-contract damages above this figure.

2. Long's postdeparture involvement in R.J.'s contracts

■ Regarding Atlantic's attempt to recover lost profits on the postdeparture contracts that Long obtained for R.J. through his contacts at Morton, Sobolewski's position hinges on the premise that while he was still employed by Atlantic, Long steered Morton to R.J., causing Atlantic to lose not only predeparture contracts but also substantial future opportunities of doing business with or through Morton even after Long had departed.

But Brunson, Morton's office manager, poured cold water on this theory at trial. Other than Long's predeparture activity, there was no other evidence to support such a claim for lost future business. Morton, it seems, had previously worked on two or three projects wherein Atlantic had been hired to insulate some buildings. Brunson, however, quickly came to dislike both Sobolewski and the product he sold and decided to look elsewhere. He heard through the grapevine at Morton that Long had left Atlantic to form R.J.[6] Morton eventually contracted with R.J. in December 1987, but Brunson flatly rejected the notion that Long had anything to do with his decision not to use Atlantic at that time. Other than Long's predeparture misconduct in obtaining contracts for R.J., there was no other evidence to support any claims for lost profits arising out of R.J.'s postdeparture contracts with third parties.

■ On these facts no reasonable factfinder could conclude that Long breached any duty to Atlantic concerning the postdeparture contracts he had obtained for R.J. Atlantic had no legal right to keep Morton from doing business with or directing business to R.J. after Long's departure. Moreover, absent any enforceable noncompetition agreement, former employees like Long can solicit their previous employer's customers for business, as long as, in doing so, they are not acting tortiously, for example, by interfering unjustifiably with their former employer's contracts, by misappropriating the employer's trade secrets, or by converting other confidential business information belonging to their former employer. *See, e.g., Callahan v. Rhode Island Oil Co.*, 103 R.I. 656, 660–61, 240 A.2d 411, 413–14 (1968); 3 Beth A. Buday and Gail A. O'Gradney, *Fletcher Cyclopedia of the Law of Private Corporations*, § 860 at 275–76 (1994).

Here, Morton's identity as a prospective customer for R.J. was not a trade secret, as it was readily ascertainable from nonconfidential sources. *Cf. Durapin, Inc. v. American Products, Inc.*, 559 A.2d 1051, 1057 (R.I. 1989) (no protectable interest where customer's identity was common knowledge and there was no evidence that plaintiff-corporation had developed a "special relationship" through its appreciation of the customer's special needs). Moreover, Morton and Atlantic did not have any sort of business or contractual relationship that would entitle a jury to conclude that but for Long's actions, Morton would have caused the future business it directed to R.J. to go instead to Atlantic. Similarly, there was no evidence

6. Long admits to having given some Morton employees advance notice of his pending departure. Although he wanted future business from Morton, he told Morton's employees that he would hold off on talking to them until he had officially resigned from Atlantic.

that the postdeparture business that evolved between Morton and R.J. was pending or "in the works" prior to Long's leaving.[7] To clinch matters, Brunson testified without contradiction that from Morton's viewpoint Sobolewski's gruff personality and Atlantic's shoddy work product were to blame for the demise of the Morton/Atlantic relationship.

In sum, on this record, we believe that no reasonable juror could have awarded lost-profit damages to Atlantic on the basis of Long's role in securing business for R.J. through his Morton contacts *after* he had left Atlantic. Thus, the trial justice should have directed a verdict in Long's favor for so much of Atlantic's lost-profit claims that were based on the postdeparture business Long had obtained for R.J.

### 3. Solicitation claims

Atlantic presented no damage evidence to support its claims concerning Long's alleged wrongful solicitation or hiring of its employees. Two of the three workers targeted by Long never left Atlantic. The third, Joyce Stiles, Long's secretary, did join R.J., but the record is silent about whether her departure damaged Atlantic. Absent any damage evidence on this claim, there was nothing here to support or enhance any damage award.

In short, the only breach-of-fiduciary-duty claims that should have gone to the jury were those relating to Long's diversion of business to R.J. while he was still working for Atlantic. And in regard to those, all claims for lost profits above the most that Atlantic could have realized on these contracts should have been directed out of the case by the trial justice.

---

7. These facts knock the legs out from under the principal case relied upon by Atlantic in support of its breach-of-duty theory here. *See Veco Corp. v. Babcock,* 243 Ill.App.3d 153, 183 Ill.Dec. 406, 611 N.E.2d 1054, *cert. denied,* 152 Ill.2d 581, 190 Ill.Dec. 912, 622 N.E.2d 1229 (1993). It is true that an Illinois appellate court there said:

"The resignation of an officer * * * will not sever liability for transactions completed after the termination of the party's association with the corporation of transactions which began during the existence of the relationship or *were founded on information acquired during the relationship.*" (Emphasis added.) 243 Ill.

### B. Atlantic's and Sobolewski's Appeal

Atlantic and Sobolewski argue at some length and with great vigor that the trial justice improperly denied their new-trial motion. But after reviewing the record, we find no reversible error.

The "modern gospel" in regard to a trial justice's duty in considering a new-trial motion is still to be found in *Barbato v. Epstein,* 97 R.I. 191, 196 A.2d 836 (1964). *See Gordon v. Campanella Corp.,* 112 R.I. 417, 420, 311 A.2d 844, 847 (1973). Essentially the trial justice functions as a superjuror who, in light of the charge to the jury, can weigh the evidence, pass on credibility, and draw appropriate inferences therefrom. *See Barbato,* 97 R.I. at 193–94, 196 A.2d at 837 (using their "independent" judgments, trial justices can "accept some or all of the evidence as having probative force," or they can reject some of the testimony "because it is impeached or contradicted" or because other circumstances make it inherently improbable). Once this evaluation is completed, the trial justice must select one of two choices. Relying on the evidence accepted and inferences drawn, the trial justice must

"decide[ ] whether to approve the verdict even against doubts as to its correctness because the evidence is nearly balanced, or is such that different minds can naturally and fairly come to different conclusions thereon; or, in the alternative, to set it aside when his [or her] judgment tells him [or her] that it is wrong because it fails to respond truly to the merits of the controversy and to administer substantial justice

---

App.3d at 161, 183 Ill.Dec. at 411, 611 N.E.2d at 1059 (citing *Comedy Cottage, Inc. v. Berk,* 145 Ill.App.3d 355, 360, 99 Ill.Dec. 271, 276, 495 N.E.2d 1006, 1011 (1986)). But the type of information referred to by *Comedy* and its progeny concerned fiduciary confidences, *see* 145 Ill.App.3d at 360, 99 Ill.Dec. at 276, 495 N.E.2d at 1011, which are not present here. And the underscored language relied on by Sobolewski has rightly been called an "overinclusive" statement that the court "cannot mean." Douglas M. Branson, *Corporate Governance,* § 8.32 at 486 (1993). In any event we choose not to adopt the broad reading of *Veco* that Atlantic urges upon us.

and is against the fair preponderance of the evidence." *Id.* at 194, 196 A.2d at 837. To comply with *Barbato*'s mandate, a trial justice need not offer an extended "dissertation of the evidence adduced at trial," *see Gordon,* 112 R.I. at 425, 311 A.2d at 849, but should provide enough reasoning so we can determine whether the decision was rationally premised. *See Morinville v. Morinville,* 116 R.I. 507, 511–12, 359 A.2d 48, 51 (1976).

■ A trial justice who faithfully follows this approach will not be reversed unless a party convinces us that the justice "overlooked or misconceived material evidence or was otherwise clearly wrong." *Fox v. Allstate Insurance Co.,* 425 A.2d 903, 907 (R.I. 1981) (quoting *Galusha v. Carlson,* 120 R.I. 204, 207, 386 A.2d 634, 635 (1978)); *accord Gordon,* 112 R.I. at 421, 311 A.2d at 847. And even if we conclude that the trial justice failed to undertake the required evidential scrutiny, we shall not cast aside the verdict if after looking at the record in a light most favorable to the prevailing party, we find "any competent evidence" that sustains it. *E.g., Fox,* 425 A.2d at 907.

Sobolewski and Atlantic assail the trial justice's decision to deny their new-trial motion on manifold grounds. Reduced to essentials, they argue that (1) the jury's award of only $18,902 against Long was inadequate given the plethora of testimony concerning his deceitful conduct and the damages Atlantic suffered as a result, (2) the imposition of a statutory penalty against Sobolewski for failing to produce corporate records was inconsistent with the jury's finding that Long had breached a fiduciary duty owed to Atlantic, and (3) the jury's verdict against Sobolewski personally on Long's stock-transfer claim was against the weight of the evidence and the applicable law. For the reasons set forth below, we find that these arguments are unconvincing.

■ The trial justice engaged in a thorough analysis while fulfilling her role as the superjuror. After patiently listening to counsel, she duly reviewed the evidence and independently assessed the witnesses' credibility. She considered both sides, determined that reasonable minds could fairly come to different conclusions, said the jury's awards were not shocking, and denied the new-trial motion. Because she has touched the appropriate bases outlined in our cases, *see, e.g., Barbato,* 97 R.I. at 193–94, 196 A.2d at 837, we find that her decision falls well within the zone in which such a denial is permissible. And since we have not been convinced that she overlooked or misconceived material evidence or was otherwise clearly wrong, her decision must stand.

■ For the reasons previously stated, the jury's award of $18,902 in Atlantic's favor, far from being inadequate, well exceeded what the evidence warranted. Moreover, Long's breach of fiduciary duty to Atlantic in 1987 did not relieve Sobolewski of his duty to produce corporate records upon receipt of a proper request from Long to do so. Given the jury's determination that Long was a minority stockholder of Atlantic at the time of the records demand and that Sobolewski's purported cancellation of this stock interest and his failure to transfer the stock to Long were in breach of his promise to do so, Sobolewski was under a legal duty to permit the records examination requested by Long if his request was made in good faith and for a proper purpose; in any event, Sobolewski was not excused from doing so merely because Long had previously breached his fiduciary duty to Atlantic. Any legitimate concerns that Atlantic and Sobolewski may have had about Long's good faith, the propriety of the purposes for his demand, or his potential misuse of such records to their competitive detriment should have been presented to a court for its consideration and possible entry of a protective order concerning such activity. But the jury was entitled to conclude that Sobolewski's potential defenses to this demand were unfounded and that he was not free simply to deny or to ignore the request with impunity.

Sobolewski's third plaint is equally unavailing. The linchpin of his argument here is that the jury overlooked the fact that the earlier stock-transfer agreement had been superseded by an unsigned 1986 accord that canceled Long's right to certain shares. However, the jury apparently believed otherwise, as it was entitled to do, since this so-called accord was never signed by both par-

ties, thereby evidencing the apparent lack of any meeting of the minds on any proposed modification of the original agreement.

■ Sobolewski's fallback position is that he should not be held personally liable on the stock-transfer claim because Long failed to pierce Atlantic's corporate veil in prosecuting this charge. But there was no corporate veil to pierce or to lift: Sobolewski, as Atlantic's sole shareholder, owned or controlled all Atlantic stock. He even admitted at trial that it was his intention to give Long his shares of Atlantic's stock, thereby diminishing the amount of shares that he would be left owning. The jury was therefore entitled to conclude that Sobolewski had breached a personal contract between Long and himself qua Atlantic's sole shareholder to transfer a portion of the stock Sobolewski owned or controlled to Long.[8] And since we have not been persuaded that the trial justice overlooked relevant evidence on a critical issue or was otherwise clearly wrong, we cannot fault her for denying the new-trial motion.

### Conclusion

The judgment against Long and in favor of Atlantic is affirmed in part and reversed in part. The trial court should have directed a verdict on Atlantic's breach-of-fiduciary-duty claim for all damages sought against Long in excess of $4,767.75. However, because the court appropriately denied Atlantic's and Sobolewski's new-trial motion, the judgment against them and in favor of Long must stand. Accordingly, the papers in this case are remanded to the Superior Court so that an amended judgment can be entered on Atlantic's breach-of-fiduciary-duty claim consistent with our opinion.

---

**8.** Even absent a contract, Sobolewski, as the majority shareholder, owed a fiduciary duty to minority shareholder Long. *See, e.g., Wilkes v. Springside Nursing Home, Inc.,* 370 Mass. 842, 848–53, 353 N.E.2d 657, 661–64 (1976) (noting and discussing the strict obligation on the part of majority shareholders in close corporations to deal with the minority with the utmost good faith and loyalty). And this fiduciary duty is one of the most rigorous that the law imposes:

"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. * * * Not honesty alone, but the punctilio of an honor the most sensitive, is * * * the standard of behavior. As to this there has developed a tradition that is unbending and inveterate." *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (Cardozo, C.J.).