DECISION ON RENEWED MOTIONS FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR A NEW TRIAL, AND MOTION TO ALTER OR AMEND JUDGMENT
Following a jury verdict in favor of the Plaintiffs, Defendants Lisa J. Jacobson, M.D. and the Women Infants Hospital renewed their motions for judgment as a matter of law and alternatively moved for a new trial pursuant to Super. R. Civ. P. Rule 50. Defendants Jacobson and Women 
Infants also filed a motion to alter or amend the judgment, as ordered by this Court, for prejudgment interest. Plaintiffs Jose Oliveira and Carrie Oliveira, the latter individually and in her capacity as administratrix, object to both motions.
 Facts and Travel
Djonen Oliveira, son of Carrie and Jose Oliveira, died 28 minutes after his birth on January 24, 1997. On February 10, 1999, the Oliveiras filed a malpractice action against the attending physician, Lisa Jacobson, M.D., and the resident on duty, Sareeta H. Bjerke, M.D. The Oliveiras also filed suit against Woman Infants Hospital, where Djonen was delivered, based on an alleged agency relationship between the Hospital and the two doctors.
A jury trial occurred over several weeks in January 2002. The Plaintiffs' alleged that the Defendant doctors failed to order and perform a cesarean section in a sufficiently timely fashion, as required by the circumstances, causing asphyxia and, subsequently, death. An autopsy report conducted three days after Djonen's death listed the cause as asphyxia, thus supporting the Plaintiffs' theory. A supplemental autopsy report, issued several weeks later, listed sepsis as the cause of death and supported the Defendants' theory. At trial, there was extensive, exhaustive expert witness testimony on behalf of all parties.
Calvin Oyer, M.D., staff pathologist at Women Infants, testified pursuant to a subpoena for the Plaintiffs. He completed the "Final Autopsy" report listing asphyxia as the cause of death. After consulting with his supervisor, Don Singer, M.D., Oyer took another look at samples taken during the autopsy. After reviewing the samples, Oyer issued an addendum to the Final Autopsy report listing sepsis as the cause of death. Oyer testified that the addendum did not change the diagnosis that asphyxia was the "mechanism" of death. However, Oyer testified that the presence of sepsis raised doubts as to the cause of the asphyxia. A second report later issued by Oyer listed only sepsis as the cause of death and made no mention of asphyxia. When asked to explain, Oyer stated that in his initial report, he meant that the patient died with asphyxia, not of asphyxia. Oyer also stated that his failure to discover the sepsis at the outset was a mistake on his part.
Harlan Giles, M.D. OB-GYN, testified for the Plaintiffs. On direct examination, Giles testified that factors existed that should have alerted the Defendant doctors that a vaginal delivery was not viable. These factors were (1) an abnormally long first stage of labor; (2) positioning of the baby during the second stage ("sunny-side up"); and (3) multiple warning signs of fetal distress on the monitor. However, on cross-examination, Giles was eviscerated. The Defendants exposed omissions and misrepresentations on the witness' curriculum vitae and "misstatements" in past depositions in other cases. The witness' credibility was shredded.
Ted Steven Rosencrantz, M.D., testified on behalf of the Plaintiffs. Rosencrantz is board certified in pediatrics, neonatology, and perinatology. He testified that Djonen died of asphyxia due to lack of oxygen prior to delivery. Further, Rosencrantz testified that Djonen did not die of anemia or as a result of anything that transpired in the days, weeks, or months prior to the delivery. Rosencrantz also testified that he saw no evidence of sepsis. On cross examination, the Defendants produced a deposition from another case in which Rosencrantz stated that he was not qualified to testify in obstetrics. That aside, the witness was firm and articulate. Rosencrantz's testimony was powerful and compelling.
Alan Kessler, M.D. OB-GYN, testified for the Plaintiffs. Kessler specializes in high risk obstetrics. He testified that Djonen died of asphyxia. Moreover, based on the monitor strips, which were not "reassuring," Kessler testified that Djonen would be alive and neurologically normal if not for the delay in performing a cesarean section.
Susan Shen-Schwarz, M.D., testified for the Plaintiffs. Shen-Schwarz is board certified in pediatrics and perinatal pathology. She testified that Djonen died of acute asphyxia and had no infection. Although on cross-examination, Shen-Schwarz became less responsive and somewhat confusing, she was most compelling in noting that had sepsis been present, samples taken at the autopsy would have all but screamed out that fact. Both firm and convincing, Shen Schwarz was an excellent witness.
The jury also heard non-medical testimony. Professor Arthur Wright, an economist, provided expert testimony on damages. Jose and Carrie Oliveira testified about events in the delivery room and their observations of their son. Their testimony included descriptions of the sounds that Djonen made, including attempts at breathing and crying and his gasping and choking.
Don Singer, M.D., the Chief Pathologist at Women Infants in 1997, opened the Defendants' case-in-chief with his testimony. Singer is a specialist in pediatric pathology and placentas, in particular. He testified that after personally reviewing Dr. Oyer's autopsy work, he found significant evidence of infection. Further, he found evidence of infection in Carrie Oliveira, as well. This evidence formed the basis of his opinion that Djonen suffered an episode of asphyxia or hypoxia between six and twenty-four hours before birth.
Singer's testimony was corroborated by Rebecca Dunn Folkerth, M.D. Folkerth is a neuropathologist with subspecialties in perinatal and pediatric neurology. She is board certified in, among other areas, anatomic pathology. She testified that her review revealed evidence of the presence of gliosis in the brain stem several days prior to delivery. According to Folkerth's testimony, gliosis is caused by the shock of infection. In her opinion, the damage to Djonen's brain was present at least one day before his birth. Therefore, according to Folkerth, Djonen's health could not have been assured even if he had been born a full day earlier.
James Allen McGregor, M.D. OB-GYN, testified for the Defendants. McGregor is a specialist in maternal fetal medicine with a special focus in inflammation and infection. He testified that because the fetal monitoring strips were "reassuring" overall, there was no indication of an asphyxiation problem. In his opinion, Djonen died of septic shock due to the presence of an infection prior to birth. The strength of McGregor's testimony was diminished when, on cross examination, he became evasive, unresponsive, and displayed rather odd communication quirks.
Henry Michael Lerner, M.D. testified for the Defendants. Lerner is an obstetrician who testified that the Defendants each met their respective standards of care. He based his opinion on overall "reassuring" fetal monitoring strips and on positive scalp stimuli. Cross-examination of Lerner revealed that he was employed by a medical malpractice insurance company and received $45,000 a year for his advocacy role.
Leonard Eisenfeld, M.D. testified for the Defendants. Eisenfeld is board certified in neonatology and perinatology. He testified that, in his opinion, the baby was infected and severely anemic. Moreover, Eisenfeld testified that Carrie Oliveira was colonized with group B strep. On cross-examination, Eisenfeld was incapable of answering a question. It was tortuous and diminished his value as a witness.
Finally, Defendants Jacobson and Bjerke testified. They both presented well. Each was bright, articulate, and candid. Each described the effort she expended to deliver Djonen as being appropriate and within the applicable standard of care. Defendant Jacobson, not withstanding some inconsistencies between her notes and testimony that she regarded as semantic issues, felt comfortable and confident that she could deliver the child vaginally. Defendant Bjerke testified that at some point in the delivery, she left the Oliveiras' room to find a colleague she knew to be particularly adept with forceps. Bjerke had assured Defendant Jacobson that Women Infants was a collegial place where everyone worked together as a team.
On January 29, the jury returned a verdict in favor of the Plaintiffs and against Defendants Jacobson and Women Infants in the amount of $2,300,000. Specifically, the jury found that Jacobson was negligent on January 24, 1997 and that Jacobson was acting as an agent of Women 
Infants'. Moreover, the jury found that Jacobson's negligence was the proximate cause of Djonen Oliveira's death. The jury also found that Defendant Bjerke was not negligent. The amount awarded consisted of $100,000 for the pain and suffering of Djonen Oliveira; $1,500,000 for the loss of society and companionship of the parents; and $700,000 for economic loss.
Following the jury verdict, Defendants Jacobson and Women Infants timely filed the motions here at issue; namely, the renewed motions for judgment as a matter of law, the alternative motion for a new trial, and a motion to alter or amend the judgment relating to prejudgment interest. In their renewed motions, the Defendants presented a number of arguments assigning error in the conduct of the trial. Specifically, the Defendants claim the following errors: allowing the Plaintiffs to cross examine Dr. Lerner about his position with a medical malpractice insurance carrier; jury instructions that excluded from consideration the absence of negligence by subsequent treating physicians who employed the same exact course of treatment as the Defendants; permitting Plaintiffs' counsel to argue for Djonen's pain and suffering without any proof thereof and then submitting the issue to the jury; instructing the jury in such a manner "that allowed the jury to conclude that the minimum amount that could be awarded" on each element of damages was $100,000; and failure to grant Defendants' motions for judgment as a matter of law. (See, generally, Defendants' Motion of February 6, 2002.) In their separate motion, the Defendants challenged the date from which the 12% statutory interest should have commenced. The Defendants assert that the September 22, 1998 letter from Plaintiffs' Counsel to Women Infants was insufficient to inform the Hospital of the impending lawsuit, as required by the statute. The Plaintiffs objected to both of these motions.
Both sides have agreed to waive their respective petitions for costs. The Defendants then presented oral arguments supporting the claims made in their written motion. They argued that September 22, 1998 was not the correct date from which to calculate interest because the letter sent on that date from Plaintiffs' Counsel to Women Infants only informed the Hospital of the potential for litigation. Additionally, according to the Defendants, the jury should have been charged that a subsequent treating physician who engaged in the exact same course of treatment as the Defendants exercised the proper standard of care and was not negligent.
Regarding damages, the Defendants argued that the verdict was excessive. The Defendants claimed there was no proof that Djonen was neurologically intact-only that he could be born alive. Therefore, they assigned error in the award for Plaintiffs' economic loss. The Defendants also asserted that although there was some testimony relating to "gasps" made by Djonen, this evidence was insufficient to show that Djonen was conscious; that chest compressions performed in the resuscitation attempts caused any pain; or that the gasps were information from which a jury could find pain and suffering. Further, the Defendants argued that the evidence supporting the consortium claim was not specific enough to form the basis of an award. Defendants' Counsel argued that the Oliveiras' testimony elicited only the fact that they missed Djonen, not that they had in mind specific experiences, i.e. "playing in the park," that were no longer attainable. Moreover, the Oliveiras' had another child after Djonen's death, and in so doing, the Oliveiras achieved what they had wanted. Finally, the Defendants argued that there was no evidence from Carrie Oliveira relating to whether she intended to keep working. In order to determine the mitigating circumstances and the extent of the loss of consortium, the jury needed to know exactly how much time she planned on spending with Djonen.
The Plaintiffs disputed most, if not all, of Defendants' contentions. They argued that there was sufficient evidence to support all of their claims. The Plaintiffs asserted that although Dr. Giles was the first witness, he was not a key witness on which the verdict ultimately relied. Specifically, the Defendants highlighted the testimony of Dr. Kessler which was highly critical of Defendant Jacobson. According to Dr. Kessler, it was incumbent upon Defendant Jacobson to order and perform the cesarean section an hour earlier than she did, at a crucial juncture evident from the monitor strips before which point Djonen would have survived. Moreover, the Plaintiffs claimed that the testimony of Drs. Shen-Swarz and Rosencrantz was sufficient to establish that Djonen did not die of an infection.
Regarding pain and suffering, the Plaintiffs posited that this Court's jury instructions were sufficient and that the descriptions of various sounds at the delivery, including gasping and attempts at crying, provided ample evidence of conscious pain and suffering. The Plaintiffs also argued that no jury instruction was required regarding the absence of negligence in the care provided by a subsequent treating physician. That doctor's treatment was removed in time and did not correspond exactly to the care given by Defendant Jacobson. The Plaintiffs concluded by stating that $1.5 million should not "shock the conscience" so as to invalidate the jury award.
 Standard of Review
Rule 50 of the Superior Court Rules of Civil Procedure, entitled "Judgment as a Matter of Law in Actions Tried by Jury; Alternative Motion for New Trial," provides in pertinent part:
 "(b) Renewal of Motion for Judgment After Trial; Alternative Motion for New Trial: Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Such a motion may be renewed by service and filing not later than 10 days after entry of judgment. A motion for a new trial under Rule 59 may be joined with a renewal of the motion for judgment as a matter of law, or a new trial may be requested in the alternative. If a verdict was returned, the court may, in disposing of the renewed motion, allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as a matter of law. If no verdict was returned, the court may, in disposing of the renewed motion, direct the entry of judgment as a matter of law or may order a new trial."
In ruling on a motion for Judgment as a Matter of Law, the trial justice must consider the evidence in the light most favorable to the nonmovant, absent any questions of credibility, but without benefit of any inferences based on conjecture, speculation, or surmise. Long v.Atlantic PBS, Inc., 681 A.2d 249, 252 (R.I. 1996) (citing Souza v.Narragansett Council, Boy Scouts of America, 488 A.2d 713, 715 (R.I. 1985)); see, also, Norton v. Boyle, 767 A.2d 668 (R.I. 2001). Our Supreme Court has determined that a verdict may be directed only when the evidence authorizes only one legitimate conclusion in regard to the outcome. Long, 681 A.2d at 252 (citing Kenney Manufacturing Co. v.Starkweather Shepley, 643 A.2d 203, 206 (R.I. 1994)).
Under these circumstances, it is the function of the trial justice to act as a "superjuror" who, in light of the charge to the jury, can weigh the evidence, pass on credibility, and draw appropriate inferences therefrom. Id. at 254 (citing Barbato v. Epstein, 97 R.I. 191, 193-194,196 A.2d 836, 837 (1964)); see, also, English v. Green, 787 A.2d 1146
(R.I. 2001). "Relying on the evidence accepted and inferences drawn, the trial justice must: `decide whether to approve the verdict even against doubts as to its correctness because the evidence is nearly balanced, or is such that different minds can naturally and fairly come to different conclusions thereon; or, in the alternative, to set it aside when his [or her] judgment tells him [or her] that it is wrong because it fails to respond truly to the merits of the controversy and to administer substantial justice and is against the fair preponderance of the evidence.'" Long, 681 A.2d at 254-255 (quoting Barbato, 97 R.I. at 194, 196 A.2d at 837). Our Supreme Court has established that a trial justice need not offer an extended "dissertation of the evidence adduced at trial, but should provide enough reasoning so reviewing court can determine whether the decision was rationally premised." Long v.Atlantic, supra., (citing Morinville v. Morinville, 116 R.I. 507, 511-12, 359 A.2d 48, 51 (1976)).
The standard for our review of the grant or denial of a motion for a new trial is also well settled. Martinelli v. Hopkins, 787 A.2d 1158, 1165 (R.I. 2001) (citing Dilone v. Anchor Glass Container Corp.,755 A.2d 818, 821 (R.I. 2000)). Like the standard for a directed verdict, on a motion for a new trial, the trial justice must review the trial evidence and exercise his or her independent judgment in passing upon the weight of the evidence and the credibility of the witnesses. Id. In doing so,
 "a trial justice sits as the super [seventh] juror and is required to independently weigh, evaluate, and assess the credibility of the trial witnesses and evidence. If the trial justice determines that the evidence is evenly balanced or is such that reasonable minds, in considering that same evidence, could come to different conclusions, then the trial justice should allow the verdict to stand . . . When this Court reviews a trial justice's decision on a motion for a new trial, his or her decision will be accorded great weight and will be disturbed only if it can be shown that the trial justice overlooked or misconceived material and relevant evidence or was otherwise clearly wrong." Id. (quoting Graff v. Motta, 748 A.2d 249, 255 (R.I. 2000) and Morrocco v. Piccardi, 713 A.2d 250, 253 (R.I. 1998) (per curiam)).
 Review of the Evidence
This case came down to a battle of the experts. In the end, the jury chose to credit the Plaintiffs' experts more than the Defendants' experts.
There was sufficient evidence to sustain the jury's verdict for economic loss, regarding which reasonable minds could differ. Dr. Rosencrantz delivered powerful testimony on behalf of the Plaintiffs. He testified that Djonen died of asphyxia due to lack of oxygen prior to delivery. Further, Dr. Rosencrantz testified that the Djonen did not die of anemia or as a result of anything that had transpired in the days, weeks, or months prior to the delivery. Dr. Rosencrantz also testified that he saw no evidence of sepsis. His credibility was not substantially damaged by the cross examination. Likewise, Dr. Shen-Schwarz provided a convincing opinion that Djonen died of acute asphyxia and had no infection. On cross-examination, her continued questioning probably served only to confuse the jury rather than discredit her direct testimony. Together, the testimony of Drs. Rosencrantz and Shen-Schwarz successfully countered the opinion of Dr. Eisenfeld regarding Djonen's prenatal neurological health and the cause of his death. Although Dr. Giles's testimony was largely discredited on cross-examination, the testimony of Drs. Shen-Schwarz, Rosencrantz, and of Kessler was sufficient to sustain the verdict.
This Court cannot say that based on the evidence presented here, there is only one possible conclusion regarding the Defendants' lack of negligence, generally, or Djonen's prospects for neurological health, specifically. To the contrary, another possible conclusion was that Defendant Jacobson's persistence in attempting a vaginal delivery when, perhaps, the circumstances warranted a cesarean section, had become a matter of pride and/or stubbornness. Defendant Bjerke's testimony regarding the collegial nature of the Hospital, coupled with the exhaustive medical testimony, justified the conclusion that but for the delay in performing the cesarean section, this tragedy would not have occurred. Therefore, the award for economic loss is sustained.
There was sufficient evidence to support the jury verdict for Djonen's pain and suffering. The testimony of Jose and Carrie Oliveira, themselves, was most compelling. They each detailed their experiences and delivery room observations in an articulate, minimalistic, and restrained manner. Their testimony served to confirm on a personal level that which the expert witnesses and the documentation had revealed in a detached, professional manner: that the sounds they heard in the delivery room were not the normal sounds of delivery. Instead, the sounds the Oliveiras heard were the sounds of a living child struggling for breath. The jury's award for Djonen's conscious pain and suffering is sustained.
There was sufficient evidence to support the jury's verdict for the Oliveiras' loss of consortium. "Parents are entitled to recover damages for the loss of their unemancipated minor child's society and companionship caused by tortious injury to the minor." R.I. Gen. Laws Section 9-1-41(c). However, that person necessarily first must prove that he or she actually did suffer a loss of consortium. Conant v. Zerva, No. 2000-438, 2002 R.I. Lexis 57 (R.I. March 15, 2002) (citing Jameson v.Hawthorne, 635 A.2d 1167 (R.I. 1994)). In Conant, the jury rejected the plaintiff's claim for loss of consortium caused by his wife's injuries. Therefore, the Supreme Court held that "neither the jury nor the trial justice had the authority to award even `nominal damages' as a result."Id. at page 7. Consequently, the trial justice in Conant was not clearly wrong in denying plaintiff's motions for additur or a new trial on his loss of consortium claim. See id. The Conant opinion closely followed the Court's decision in Jameson v. Hawthorne. In Jameson, the Court sustained the trial justice's ruling that directed a verdict in favor of the defendants in a loss of consortium action where the plaintiff's father never testified and the plaintiff's mother failed to establish any "loss" pursuant to the language of Section 9-1-41. See 635 A.2d 1167, 1172.
Both Conant and Jameson are distinguishable from the present case. Neither Conant nor Jameson involved fatal injuries. In Conant, the jury rejected the Plaintiff's claim. In Jameson, the plaintiff's father did not testify and the plaintiff's mother failed to establish any loss. Here, the Oliveiras testified that they would miss Djonen. Further, the jury heard that the Oliveiras wanted a child and had been trying for some time. After considering this testimony, the jury found in favor of the Oliveiras. The Oliveiras were not required to explain, in explicit detail, how they planned to play or spend time with Djonen. Carrie Oliveira was not required to prove the quantity of time that she planned to spend with Djonen. Such a requirement would ignore the quality of the time that the Oliveiras planned to spend with Djonen, which was within the province of the jury to determine from the testimony. The mere fact that subsequent to Djonen's death, the Oliveiras gave birth to another child did not negate their feelings for their deceased child. Therefore, the Oliveiras' award for loss of consortium is sustained.
There was no error of law warranting a new trial in allowing the Plaintiffs to cross-examine Dr. Lerner regarding his position with a medical malpractice insurance carrier. The Rhode Island Supreme Court has held that "[a] basic purpose of cross-examination is to impeach the credibility of an adversary witness, and a court may within its sound judicial discretion permit interrogation designed to accomplish that purpose." Rambone v. Town of Foster, 741 A.2d 283, 284 (R.I. 1999) (quoting Bedrosian v. O'Keefe, 100 R.I. 331, 334, 215 A.2d 423, 425 (1965)). In an effort to establish himself as an expert before the Court, Dr. Lerner submitted a curriculum vitae that omitted his position and the substantial compensation that he received from the insurance company. The testimony elicited on cross-examination was not used to establish the existence of negligence, as prohibited by the Rhode Island Rules of Evidence, Rule 411. Instead, the Plaintiffs were allowed to expose the subject information, which went directly to Lerner's credibility or bias. There was no error in refusing to instruct the jury concerning the lack of negligence by a subsequent treating physician who engaged in the same course of action as Defendant Jacobson. Defendant Jacobson's argument mischaracterized the facts as they were presented to the jury.
There were key differences between the actions taken by Jacobson and the subsequent treating physician. Notably, there was a critical issue of timing that distinguished the actions performed by both doctors. Also, as argued by the Plaintiffs' in the hearing, there was a difference in the physical place where the treatment was performed: Dr. Jacobson had attempted to deliver Djonen with forceps in the birthing room while the subsequent treating physician tried one last time to deliver him with forceps in the operating room before starting the cesarean section. Thus, the actions of the two doctors were too dissimilar to warrant a jury instruction.
 Prejudgment Interest
R.I. Gen. Laws Section 9-21-10(b) provides, in part:
 "In all such medical malpractice actions in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date of written notice of the claim by the claimant or his or her representative to the malpractice liability insurer, or to the medical or dental health care provider or the filing of the civil action, whichever first occurs."
In the present case, this Court added 12% statutory interest, pursuant to Section 9-21-10, from September 22, 1998, the date of a letter from Plaintiffs' Counsel. That letter stated:
 "Our office represents the Oliveira family for a potential medical negligence action with respect to Ms. Oliveira's labor and delivery at Women Infants Hospital. Please forward this letter to your insurance carrier and have them contact me about this matter."
The letter, addressed to Debbie Gard at Women Infants Risk Management, also provided the patient's name and date of hospitalization.
The Plaintiffs argue that this letter fully complies with Section9-21-10, particularly when considered in conjunction with the affidavit of Plaintiff's Counsel. The Defendants allege that the letter provided notice of only a potential action and thus did not comply with the strict language of Section 9-21-10. Therefore, the Defendants claim that the interest should be calculated from the date of filing, February 10, 1999. However, the Defendants' interpretation of Section 9-21-10, which adds a requirement of a definite statement of claim, is without support. The statute provides for two potential dates from which to calculate interest: the date of a written notice and the necessarily subsequent date of filing. A claim does not become "definite" until filing, no matter how definite the language used in a written notice. Thus, to interpret this statute to require notice of a definite claim would completely negate the possibility of an earlier date from which to calculate interest and would also damage the prospects of an interim settlement. Calise v. Hidden Valley Condominium Ass'n, Inc., 773 A.2d 834, 839 (R.I. 2001) ("Voluntary settlement of disputes has long been favored by the courts"). Therefore, this Court's previous ruling calculating prejudgment interest from that date stands.
 Conclusion
After hearing and considering the evidence presented at trial and on which reasonable minds could differ, this Court finds competent and credible evidence to sustain the jury's verdicts on economic loss, conscious pain and suffering, and loss of consortium. The damage award does not shock the conscience of the court. Moreover, this Court finds no errors of law relating to the cross-examination of Defendants' expert witness or jury instructions so as to warrant a directed verdict or a new trial. Accordingly, the Defendants' renewed motions for judgment as a matter of law and alternative motion for a new trial are denied.
The September 22, 1998 letter from Plaintiffs' Counsel provided sufficient written notice of the claim. Defendants' motion to alter or amend judgment relating to prejudgment interest is denied.
By agreement of the parties, both sides have herein waived their respective petitions for costs.
All counsel shall submit separate orders on behalf of the Estate of Djonen Oliveira and for Jose and Carrie Oliveira, individually, for entry.