DECISION
The Defendants,[1] Johnson Wales University and Agostini Construction Company, Inc., move for judgment as a matter of law to release the property known as "32 Page Street" from a mechanic's lien in favor of the Plaintiff, Keystone Elevator, Inc. Following a nonjury trial, the Defendants timely renewed their motion for judgment as a matter of law pursuant to Superior Court Rules of Civil Procedure Rule 52. The Plaintiff objects to the Defendants' motion. The ruling on the motion is herein consolidated with a decision on the merits.
 Facts and Travel
This case arises out of a contract dispute between Keystone Elevator (Keystone or Plaintiff), as subcontractor, and Agostini Construction Company (ACC), as general contractor, regarding the construction of a new dormitory at Johnson Wales University (JW).
On January 6, 1999, ACC presented Keystone with a proposal for a subcontract agreement to install two electric elevators in a building under construction commonly referred to as "Johnson Wales University — New Residence Hall, 32 Page Street." (Plaintiff's Exhibit #2). ACC would pay Keystone $221,200 for this work. Keystone would receive a 30% deposit and be allowed eight weeks for installation after the elevator shaft was appropriately prepared by ACC. The proposal also specified a completion date of August 1, 1999. Further, the proposal provided a liquidated damages clause of $1,000 per day and stated that the "[p]roject schedule as provided by Agostini Construction must be strictly maintained." Through authorized agents, both parties signed the agreement by January 23. (January 23rd Agreement).
Problems ensued over the course of construction. Apparently, the "agreement" was modified over the course of dealings to account for miscellaneous delays. The scope and effectiveness of these subsequent "agreements" form the "foundation" of this construction dispute.
On July 28, 1999, Keystone drafted "Changeorder Proposal #1," which stated "[p]er your request to expedite completion and turnover of the two (2) passenger elevators . . . there will be a cost of Fifty One Thousand Dollars ($51,000.00)." (Plaintiff's Exhibit #3). Attached to the Changeorder was a list of qualifications. These qualifications specified "[u]ninterrupted electrical power must be available no later than July 30," and that Keystone would "commence with this work and continue uninterrupted until completion August 30, 1999[.]" (Emphasis in original.)
Seven days later, a document entitled "RE: Johnson Wales, Overtime Rate" (August 11th Document) appeared. (Plaintiff's Exhibit #4). It provided:
 "All overtime to be performed at double time rates per standard agreement, International Union of Elevator Constructors as follows:
 `the regular working day shall consist of eight (8) hours worked consecutively with an unpaid lunch period, between 6 AM and 5 PM five days per week, Monday through Friday inclusive.' Hours of work at this jobsite are 7 AM to 3:30 PM, Monday to Friday.
 `Work performed on construction work on Saturdays, Sundays and before and after the regular working day on Monday to Friday, inclusive, shall be classed as overtime, and paid for at double the rate of single time.'"
This agreement continues by listing several specific provisions for ACC's payment of overtime for the labor provided by Keystone. These provisions included a premium time rate payment of $145 per team of men per hour worked; the method of calculating overtime billing, which would be by tickets signed by ACC's site supervisor; and a statement that all other expenses outside the "specifications" would incur an additional cost. There were also three additional lines on the agreement that were crossed-out. The eliminated clauses contained a zone expense provision, a travel expense provision, and a travel time provision. The same list of qualifications that appeared in Keystone Changeorder #1 was attached as part of this second document. Steve Agostini, president of ACC, signed the document on August 11.
Keystone performed "overtime" work from August 6 through August 29. According to Keystone, the bill for this work totaled $39,403.75. To support this total, Keystone submitted time sheets showing the time worked by Keystone teams. (See Plaintiff's Exhibit #7). Some of these time sheets were signed by an ACC representative as specified in the August 11th Document, and some were not. Both elevators were completed by September 8, 1999. Steve Agostini signed Keystone's Final Inspection, Release and Acceptance form on that date. (Plaintiff's Exhibit #6.)
There were additional "Change Orders" drafted by ACC. On December 15, 1999, ACC issued Change Order #2, which authorized an $850 payment to Keystone for the installation of two cameras, one in each elevator. (Plaintiff's Exhibit #18). One week later, Change Order #3 authorized ACC to pay Keystone $1,375.50 for specific invoices covering service calls. (Plaintiff's Exhibit #17). Both of these Change Orders contained nearly identical language, stating: "NOTE: THIS CHANGE ORDER BECOMES PART OF AND IN CONFORMANCE WITH THE EXISTING CONTRACT. . . ." After this language, both Change Orders contain a running tally of the total approved contract price. For instance, Change Order #3 stated that on December 21, the previous contract amount totaled $221,321.38, and with the authorization, the revised contract total would be $222,678.88. Following the tallies, both Change Orders stated: "ACCEPTED: The above prices and specifications of this Change Order are satisfactory and are hereby accepted. All work to be performed under same terms and conditions as specified on original contract unless otherwise accepted." Both of these Change Orders were signed by representatives of Keystone and ACC.
ACC also took several credits through the use of these "Change Orders," which shared the language and form of its other Change Orders. On September 16, ACC issued its own Change Order #1, charging Keystone $728.62 for costs related to hoisting that Keystone was supposed to pay but that were, in fact, paid by ACC. (Defendant's Exhibit E). This Change Order was signed by a representative of ACC but not a representative of Keystone. Further, on January 26, 2000, ACC issued its Change Order #4, which deducted $13,750 from the total bill for a direct payment that ACC made to one of Keystone's suppliers. (Defendant's Exhibit F). According to Change Order #4, the last of the Change Orders, the total contract price after that credit was $208,928.88. Change Order #4 was unsigned.
Keystone also submitted a series of seven invoices to ACC for services that Keystone claims it performed beyond the scope of the original deal. These invoices totaled $13,685.50. Evidence suggests that ACC's "Change Order #3" covered three of these invoices. (See Plaintiff's Exhibits 12, 13, and 15). ACC subsequently paid Keystone $221,000 on the original contract plus $8,000 based on an alleged oral agreement that Keystone was "not to exceed" that amount for these additional services and for overtime.
ACC filed suit on January 25, 2000. (C.A. No. 00-406). In its complaint, ACC claims that Keystone breached its subcontract by failing to complete work in a timely fashion, failing to complete work in accordance with project specifications, failing to pay its vendors, failing to provide releases and waivers of lien forms from all vendors, failing to attend subcontractor coordination meetings, and by failing to repair warranty items. Further, ACC asserted that Keystone "negligently failed to comply with its subcontract agreement to provide timely and workmanlike performance." ACC sought recovery under general contract principles, warranty, and restitution for direct payments it made to Keystone's suppliers.
Keystone filed suit on February 11, 2000 seeking $45,089.25, the amount that it claims is outstanding on the August 11th "agreement" for overtime expenses and for unpaid invoices, plus pre-judgment interest and attorney's fees. (M.P. No. 00-767). Keystone also petitioned the court for enforcement of a mechanic's lien against the property, which the court granted. On June 12, 2001, the Defendants filed a motion to dismiss the mechanic's lien. The court, Procaccini, J., denied this motion on August 31. However, the court did grant Defendants' motion to consolidate ACC's and Keystone's proceedings at that time.
This Court held a nonjury trial over three days in early October. At the beginning of the trial, the Defendants again renewed their motion to dismiss the Keystone's mechanic's lien against the property for failure to file a notice of lis pendens with the Recorder of Deeds for the City of Providence as required by statute. This Court reserved judgment.
At trial, ACC's evidence consisted of the testimony of Steve Agostini, together with the testimony of ACC's project manager Richard Russell. ACC also presented testimony from Tom Verdi, the foreman for Commercial Electric, the electrical subcontractor on the project. Keystone's evidence included testimony of its president, Brian Haggerty, and the testimony of its construction supervisor, Hugh "Sam" Dudley. As ACC notes in its memorandum, "[t]he testimony of Steve Agostini and Brian Haggerty is opposed in virtually all respects." (Defendants' Memorandum at 2.) The key issues disputed in the testimony concern the scope of the August 11th Document; the date the elevator shaft was ready for installation of the elevators by Keystone; the expected date for completion of the installation; the causes for the delays in construction; and, the application of payments made and credits taken by ACC.
ACC claims that the August 11th Document was a proposal never intended by the parties as a final and complete expression of the agreement. ACC thus offered parol evidence to assist the court in the interpretation of the agreement. Steve Agostini testified that the final expression of the parties was the oral agreement to limit overtime expenses to $8,000. He further testified that ACC was generally unsatisfied with Keystone's performance, and that Keystone was the source of many of the delays that necessitated discussion regarding an extension of time. (See Defendants' Exhibit K 2.) Specifically, Agostini claimed that Keystone failed to properly prepare and deliver equipment that needed to be installed during the construction of the shaft itself. Agostini, along with Russell and Verdi, also testified that the shaft was prepared and ready for installation, closed to weather and with full electrical service by July 28.
Conversely, Haggerty testified that the August 11th Document constituted a complete agreement that was unambiguous on its face, extending the time for performance to September 1. He further denied any oral agreements to limit expenses to $8,000. Haggerty, along with Dudley, testified that the shaft was not properly prepared, closed to weather and with the correct electrical service until August 10. Finally, in support of its claim for overtime billing on the unsigned sheets, Keystone submitted its own internal hourly billing records. (See Plaintiff's Exhibit #8.)
At the close of all of the evidence, the Defendants renewed their motion for a judgment as a matter of law in regards to the mechanic's lien. Pursuant to instructions from this Court, in lieu of closing arguments, both parties submitted post-trial memoranda addressing both the merits of the case, as well as Defendants' renewed motion.
ACC submits that the testimony of Keystone's witnesses concerning the date that the elevator shaft was properly prepared is not credible. To support this assertion, ACC relies heavily on its own internal documents that, along with the testimony of Verdi (the independent contractor), contradicts Keystone's assertion that the shaft was not ready until August 10. Therefore, ACC argues that Haggerty's testimony denying the existence of the $8,000 oral limit on overtime expenses likewise should not be believed. Regarding credits, ACC claims that Keystone's accounting techniques make it impossible for ACC to determine which invoices are considered paid and which are considered unpaid. Further, in the event that the Court should find for Keystone, to which ACC continues to object, ACC requests that the Court subtract the $13,750 payment that ACC made directly to Keystone's supplier and that the Court make any payment from ACC to Keystone conditional on Keystone's providing releases for this equipment as required in the contract. As for the merits, ACC refers this Court back to the original document, the January 23rd Agreement, which specified an August 1 completion. ACC contends that the August 11th Document did not supersede this completion date, and that any delay in the construction was caused by Keystone's failure "to provide sufficient labor and the timely delivery and installation of equipment." (Defendants' Memorandum at 7.)
Keystone counters by referring to Steve Agostini's testimony given on cross-examination. There, Agostini stated that the deadline for a completion of the elevators was twice extended, with the final date moved to September 1. (Plaintiff's Memorandum at 4.) Further, Keystone asserts that Agostini "conceded that Keystone was on time with one elevator and just a week late with the second elevator," and that when asked if ACC was damaged at all by the September 8 delivery of the second elevator, "Agostini said no." (See id. at 4-5.) Keystone asks this Court not to consider Agostini's testimony regarding the $8,000 oral limit on overtime expenses, as the August 11th Document was clear and unambiguous on its face. Alternatively, Keystone argues that Agostini's testimony be considered not credible, as Agostini is an experienced businessman who would have placed the limit into the writing signed by both parties along with the other changes to the document that he had already made.
 Defendants' Motion for Judgment as a Matter of Law
Rule 52 of the Rhode Island Superior Court Rules of Civil Procedure governs the Defendants' motion for judgment as a matter of law. It provides, in part:
 "(c) Judgment on Partial Findings. If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule. . . ."
The 1995 Committee Note further explains that "[t]he addition of subdivision (c) represents a transfer from Rule 41(b). It parallels amended Rule 50(a) and is applicable to non-jury trials."
In deciding a motion for judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure, the trial justice "views the evidence in the light most favorable to the nonmoving party and, without weighing the evidence or assessing the credibility of the witnesses, draws all reasonable and legitimate inferences therefrom in the nonmoving party's favor." McLaughlin v. Moura, 754 A.2d 95, 98 (R.I. 2000) (citation omitted). Reasonable inferences are those which are based on more than mere "conjecture, speculation, or surmise." See Long v. Atlantic PBS, Inc., 681 A.2d 249, 252 (R.I. 1996). "[I]n factual circumstances in which no reasonable jury could find for the nonmoving party, the motion should be granted." McLaughlin, 754 A.2d at 98 (citation omitted). If "there remain factual issues upon which reasonable persons might draw different conclusions, the motion for [judgment as a matter of law] must be denied, and the issues must be submitted to the jury for determination." DeChristofaro v. Machala, 685 A.2d 258, 262 (R.I. 1996) (citations omitted).
As an initial matter, Keystone argues that because Defendants' previous motion to dismiss was denied "with prejudice" before another judge of the Superior Court, the ruling forms the law-of-the-case which should not be disturbed by this Court. However, Keystone admits that law-of-the-case principles will not bar reconsideration of an earlier order when evidence has been introduced in the interim that significantly extends or expands the record. See Richardson v. Smith, 691 A.2d 543 (R.I. 1997). Here, in the interim, an entire trial has taken place. Therefore, the law-of-the-case doctrine is inapplicable.
Nonetheless, ACC has not introduced sufficient evidence to successfully challenge the mechanic's lien. ACC raised neither new evidence nor new arguments to challenge the validity of the mechanic's lien. Accordingly, this Court expressly adopts the previous findings of the Superior Court in that Keystone did file a notice of lis pendens with the Recorder of Deeds for the City of Providence as required by statute. (See Keystone's Memorandum, Exhibit A). Further, viewing the evidence in the light most favorable to Keystone, the nonmoving party, Keystone has presented sufficient evidence that, if believed, would sustain the merits of its contract claim. Therefore, the decision on this motion will require a determination of credibility and findings of fact that renders judgment as a matter of law inappropriate under Rule 52 (using the standards from Rule 50). Thus, the motion is hereby denied.
 Standard of Review — Nonjury Trial
In a nonjury trial, "the trial justice sits as a trier of fact as well as law." Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). "Consequently, [s]he weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences." Id. "The task of determining the credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury." Walton v. Baird, 433 A.2d 963, 964 (R.I. 1981). "It is also the province of the trial justice to draw inferences from the testimony of witnesses. . . ." Id. See also Rodriques v. Santos, 466 A.2d 306, 312 (R.I. 1983) (the question of who is to be believed is one for the trier of fact).
 The Evidence Before the Court
The record and testimony before this Court are confusing, contradictory and present two very different accounts of the events which surround this controversy. Consequently, this Court must weigh the credibility of the witnesses and draw appropriate inferences. "[I]nferences drawn from contradictory evidence are properly within the domain of the trier of facts." Soucy v. Martin, 121 R.I. 651, 656, 402 A.2d 1167, 1170 (1979). "[W]here the trier of fact expressly accepts the testimony of a witness, which testimony is in conflict with that of another, the acceptance of one is an implied rejection of the other." State v. Correia, 106 R.I. 655, 663, 262 A.2d 619, 624 (1970).
There are five separate issues which must be addressed. These include: (1) whether there is an enforceable contract between the parties and, if so, what its terms are; (2) whether there was an enforceable modification, and if so, what the modified terms are; (3) whether ACC waived certain provisions in the original contract; (4) whether to apply the payments made and the credits taken by ACC; and (5) whether to assess attorney's fees and pre-judgment interest.
The first issue — the existence of an enforceable contract — is not disputed. The elements of a contract are competent parties, subject matter, legal consideration, mutuality of agreement, and mutuality of obligation. Rhode Island Five v. Medical Associates of Bristol County, Inc., 668 A.2d 1250, 1253 (R.I. 1996). The January 23rd Agreement contains sufficient evidence of all of these elements. Both parties are seeking to enforce rights accorded in the January 23rd Agreement, and neither party is challenging its validity. Where a contract is clear and unambiguous, the meaning of its terms constitutes a question of law for the court, and it is only when ambiguity exists that construction of its terms becomes one of fact. See Rotelli v. Catanzaro,686 A.2d 91 (R.I. 1996); Hoder v. United Services Auto. Ass'n, 637 A.2d 357
(R.I. 1994) (quoting O'Connor v. McKanna, 116 R.I. 627, 634, 359 A.2d 350, 353 (1976)). Neither party has challenged the terms of the January 23rd Agreement, and this Court finds that it constituted an unambiguous contract as a matter of law.
The second issue, modification, is more problematic. A modification to an enforceable contract requires that the parties assent to the essential terms of their obligations and that an agreement embrace these terms. Fondedile, S.A. v. C.E. Maguire, Inc., 610 A.2d 87,92 (R.I. 1992). The modification can be written, oral, or implied, but the burden of proving the existence of the modification rests with the party alleging the new contract. Id. To satisfy this burden, the party alleging the modification must show that the parties demonstrated both subjective and objective intent to be bound by the new contract's terms. Id.
There are potentially four different exchanges that could be characterized as modifications: the August 11th Document, the oral agreement to limit expenses to $8,000, Keystone's additional invoices, and ACC's Change Orders. The most important of these is the August 11th Document. Again, the parties here do not dispute the validity of the Document itself. Instead, ACC claims that the "overtime proposal was never intended by the parties as a final complete expression of their agreement." (Defendants' Memorandum at 4.) However, Steve Agostini provided evidence of his objective intent to be bound by the terms included therein by signing the Document. His subjective intent can be inferred by his alteration of some of the terms on the face of the Document itself. Agostini is an experienced businessman who, through the complex and rigorous accounts payable system that his company implemented for its suppliers, obviously understood the scope and importance of the written document. Thus, Keystone satisfied its burden by demonstrating Agostini's subjective and objective intents to be bound to the new terms. This Court finds that any testimony that Agostini provided to the contrary is not credible. As a matter of law, the August 11th Document contained sufficient evidence to satisfy the other elements necessary to establish an enforceable contract on its own (i.e. competent parties, subject matter, legal consideration, mutuality of agreement, and mutuality of obligation).
The other important contested issue in this case concerns the interpretation of the terms in this modification. Parol or extrinsic evidence is admissible to complete or clarify a written instrument which appears on its face to be incomplete or ambiguous or to show a condition precedent on which existence of a written contract depends. Supreme Woodworking Co. v. Zuckerberg, 82 R.I. 247, 253,107 A.2d 287, 290 (1954). While parol evidence is admissible to show condition precedent on which existence of written contract depends in order to establish that no valid contract came into existence, such evidence is not admissible to show a condition subsequent which would nullify or modify an existing agreement, especially where such condition subsequently directly varies or contradicts obligation itself or consideration expressly stated and accepted in written agreement. Id.
If a contract is clear and unambiguous, the meaning of its terms presents a question of law for the court. Rotelli, 686 A.2d 91, 94. Whether the terms of a contract are clear and unambiguous is itself a question of law, and the court may consider all the evidence properly before it in reaching its conclusion. Id. "In determining whether a contract is clear and unambiguous, the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning." Id. The Rhode Island Supreme Court has consistently held that a contract is ambiguous only when it is reasonably and clearly susceptible of more than one interpretation. Id.
In the present case, the August 11th Modification itself, as a whole, is ambiguous. There is neither reference to the original contract nor is there a statement regarding consideration in the August 11th Modification. Such omissions create an ambiguity on the face of the contract. Therefore, parol evidence is admissible either to explain the terms or to show an agreement subsequent to the writing. Lisi v. Marra,424 A.2d 1052 (R.I. 1981).
However, ACC failed to prove the existence of an oral modification creating an $8,000 limit on overtime expenses. Although the parol evidence rule does not bar a party from demonstrating a modification by subsequent oral agreement, that party retains the burden of proving the other party's acceptance of such modification in a manner that satisfies the requirements of a valid contract. Id. at 1057. Here, Agostini's testimony alone was insufficient to meet its burden of demonstrating Keystone's intent to be bound by an $8,000 limit. And although the rejection of Keystone's Changeorder #1 provides some evidence of a lower "limit," an equally likely explanation is that ACC simply chose an hourly billing plan because it thought that option might be cheaper than the flat rate of $51,000. As a matter of law, there was no separate oral modification limiting the expenses to $8,000.
These facts are also applicable to the interpretation of the terms of the August 11th Modification, and further supported by inferences that can be drawn from the circumstances surrounding it. In the original contract, Keystone had eight weeks for installation. Therefore, work on the elevator needed to commence on or about June 1 in order to meet their August 1 deadline. Even accepting ACC's earliest date in July that the shaft was ready for installation, this would have left Keystone with less than the requisite eight weeks designated in the January 23rd Agreement. Moreover, ACC has neither claimed nor demonstrated that Keystone caused six weeks' worth of delays. Instead, Agostini himself testified that the project deadlines were critical because students were returning to campus and needed to move into the dorm. Thus, it was important for him to speed the construction process, including the installation of the elevator shaft. It is thus reasonable to infer that this need prompted ACC to reconsider some of the terms in the original contract, including the completion date, the use of overtime, and a payment premium for Keystone's assent to the new terms. Also, ACC never sought to enforce the liquidated damages provision of its original contract against Keystone, demonstrating that ACC believed that the delivery of the elevators was extended to September 1 and that Keystone was on-time with its delivery. As a matter of fact, this Court rejects ACC's interpretation of the August 11th Modification to include an $8,000 limit and that the original contract completion date was not extended. Therefore, the clear and unambiguous terms of the August 11th Modification control this dispute: $145 per team per hour, September 1 completion date, and billing by time sheets signed by ACC representatives.[2] Although this Court accepts Keystone's internal billing records as evidence of time worked for the unsigned service invoices and although ACC never disputed that Keystone performed this work, this Court finds, as a matter of fact, that ACC never separately agreed to pay for these services. The invoices were not properly formatted, and thus, recovery is not allowed under the strict letter of the August 11th Modification. Accordingly, ACC shall pay Keystone $31,247.50 for overtime work approved by ACC and submitted in the properly formatted manner.
As for the invoices and Change Orders, this Court finds that both parties were "piling-on" in order to expand their claims. The original contract required that "[e]xtra work must be authorized by Agostini Construction." (Plaintiff's Exhibit #2 at page 3). The course of dealing between the two parties establishes that the Change Order was the preferred method of authorizing this extra work. The two Change Orders that were drafted by ACC and signed by both parties expressly modified the terms of the original contract. These two signed Change Orders became part of the original contract, as they evinced an intent by both parties to be bound by their terms and, thus, constituted an enforceable modification. This Court finds, as a matter of law, that Keystone did not establish that its other invoices, save the ones mentioned in the signed Change Orders, constituted an enforceable contract or modification.[3]
Likewise, as a matter of law, ACC did not convince this Court by sufficient evidence that the unsigned Change Orders, which self-authorized credits, constituted an enforceable contract or modification. For the above reasons, ACC shall pay Keystone $2,207.50 on Change Orders #2 and #3.
The third issue involves whether ACC waived the right to demand that Keystone provide releases from its suppliers as required in the original contract. "[W]aiver is the voluntary, intentional relinquishment of a known right." Violet v. Travelers Exp. Co., Inc., 502 A.2d 347, 349 (R.I. 1985). Contractual rights may be waived by conduct inconsistent with the express terms of the agreement. Id. As a general rule, whether a party has voluntarily relinquished a known right is a question for the trier of fact. Id.
In the case-at-bar, the January 23rd Agreement provides that "[r]elease and waiver of lien forms from all subcontractors . . . and all material suppliers must be current through the previous month's requisition."[4]
(See Plaintiff's Exhibit #2 at 3, item 6.) ACC argues that because Keystone failed to provide such releases from its suppliers and because these releases form a "precondition for payment," any further payment that ACC is ordered to make to Keystone should be conditioned on Keystone's providing the releases. (ACC's Memorandum at 6.) However, ACC provided no evidence that it demanded these releases until after the start of the litigation. (See Plaintiff's Memorandum at 13.) According to the terms of the Agreement, ACC had an opportunity to demand that its subcontractors keep these releases current through the previous month's requisition. Further, ACC had a powerful tool, in the form of a substantial liquidated damages provision, to compel Keystone's compliance with this provision. By failing to insist that Keystone provide these releases at the end of the month, as a matter of fact, ACC acted so as to waive its right to enforce this provision.
The fourth issue revolves around the payments made and credits taken by ACC for a $13,750 payment that it made to Keystone's suppliers for certain parts, the payment responsibility for which belonged to Keystone under the contract. Although ACC fails to articulate a precise legal theory under which it would be entitled to reimbursement for this sum, ACC has arguably asserted a claim for unjust enrichment.[5]
It is well settled that "in order to recover under quasi-contract for unjust enrichment, a plaintiff is required to prove three elements: (1) a benefit must be conferred upon the defendant by the plaintiff, (2) there must be appreciation by the defendant of such benefit, and (3) there must be an acceptance of such benefit in such circumstances that it would be inequitable for a defendant to retain the benefit without paying the value thereof." Bouchard v. Price, 694 A.2d 670, 673 (R.I. 1997) (quoting Anthony Corrado, Inc. v. Menard Co. Building Contractors, 589 A.2d 1201, 1201-02 (R.I. 1991)). Restitution is the proper remedy for a claim of unjust enrichment. See Eastern Motor Inns, Inc. v. Ricci, 565 A.2d 1265
(R.I. 1989). A party who has conferred a benefit upon another by mistake is not precluded from maintaining an action for restitution because the mistake was caused by that party's own lack of care. Romano v. Retirement Bd. of Employees' Retirement System of R.I., 767 A.2d 35, 44 (R.I. 2001); see Toupin v. Laverdiere, 729 A.2d 1286, 1289 (R.I. 1999) (holding that a party has "a cognizable action to seek the return of his money even though the overpayment might have been the product of his own negligence"); see also Woonsocket Teachers Guild Local Union 951 v. Woonsocket School Committee, 694 A.2d 727, 729 (R.I. 1997). However, where there is change of circumstances that would make restitution unjust and inequitable, the loss must be borne by the party making the mistake. Jonklaas v. Silverman, 117 R.I. 691, 698-699, 370 A.2d 1277, 1282 (1977).
Keystone argues that because its suppliers cannot sue ACC due to lack of privity of contract, Keystone remains liable to its suppliers, and thus, ACC's payments that Keystone may or may not have owed are irrelevant. However, Keystone's argument overlooks the fact that ACC already paid one such bill, arguably discharging Keystone's liability and conferring a substantial benefit of additional profit. Agostini testified that the elevators did not operate shortly after installation and were in need of repair. (See ACC's Memorandum at page 5.) Evidence further shows that when Keystone was notified and refused to take action on this problem, ACC negotiated directly with Keystone's supplier to obtain a replacement part that was necessary to make the elevators operational. (See id.) If Keystone were unsatisfied with the performance of its suppliers or the state of the merchandise as delivered, it was Keystone's obligation to present facts regarding the value of the goods and services actually delivered by its suppliers. This is a burden that Keystone did not convincingly accomplish. Keystone's dissatisfaction with its suppliers' performance alone did not excuse its obligation to ACC to provide a working elevator in a timely manner. Again, time was of the essence. ACC needed the replacement part, and Keystone did not provide it, leaving ACC with few options but to pay for the parts that the supplier in question, Motion Control Engineering, Inc., would not deliver without an advanced payment. Here, it would be inequitable for Keystone to retain the benefit without crediting ACC for the $13,750 payment. Therefore, under the doctrine of unjust enrichment, ACC should be allowed a set-off from the judgment in the amount of $13,750 and should "stand in the shoes" of Keystone for any subsequent litigation regarding Motion Control Engineering, Inc.
Finally, Keystone seeks recovery of attorney's fees and interest pursuant to three statutes: Gen. Laws. 1956 § 9-1-45 (Attorney's Fees); Gen. Laws. 1956 § 9-21-10 (Pre-Judgment Interest); and Gen. Laws. 1956 § 34-28-19 (Costs — Mechanic's Liens). In order to award attorney's fees pursuant to Gen. Laws. 1956 § 9-1-45(1), the trial justice must find that "there was a complete absence of a justifiable issue of either law or fact raised by the losing party." Insurance Co. of North America v. Kayser-Roth Corp., 770 A.2d 403, 419 (R.I. 2001). It is well settled that the award of attorney's fees rests within the discretion of the trial justice. Greensleeves, Inc. v. Smiley, 754 A.2d 102, 103 (R.I. 2000). Here, ACC was "victorious" on at least some of its claim, precluding an award of attorney's fees under § 9-1-45(1).
However, according to § 34-28-19:
 "[t]he costs of the proceedings shall in every instance be within the discretion of the court as between any of the parties. Costs shall include legal interest, costs of advertising, and all other reasonable expenses of proceeding with the enforcement of the action. The court, in its discretion, may also allow for the award of attorneys' fees to the prevailing party."
Rule 1.5 of the Rhode Island Supreme Court Rules of Professional Conduct provides the factors to be used in determining the reasonableness of an attorney's fee. These factors include:
 "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
 (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
 (3) the fee customarily charged in the locality for similar legal services;
 (4) the amount involved and the results obtained;
 (5) the time limitations imposed by the client or by the circumstances;
 (6) the nature and length of the professional relationship with the client;
 (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
 (8) whether the fee is fixed or contingent."
"[T]he determination of whether an attorney's fee is reasonable requires particular facts in the form of affidavits or testimony upon which the trial court may premise a decision." St. Jean Place Condominium v. Decelles, 656 A.2d 628 (R.I. 1995) (citing Colonial Plumbing Heating Supply Co. v. Contemporary Construction Co., 464 A.2d 741 (R.I. 1983)). Again, the amount awarded in attorney fees is within sound discretion of the trial judge in light of the circumstances of each case. Schroff, Inc. v. Taylor-Peterson, 732 A.2d 719 (R.I. 1999).
Here, Keystone's Counsel (Counsel) seeks reimbursement for fees in the amount of $13,833, and attaches his billings as an exhibit to his memorandum. Counsel also submits an expert affidavit from Patrick J. Quinlan, swearing to the reasonableness of the Counsel's billings in a debt collection action such as this. However, Quinlan considered only a portion of Counsel's requested reimbursement. Apparently, Counsel submitted an additional reimbursement request in the amount of $1,500 to cover trial preparation costs that was not reviewed in Quinlan's affidavit. Therefore, for the purpose of Rule 1.5, this Court finds that Counsel's requested fee, excluding the $1,500 in trial preparation time, is a reasonable fee for the work performed. From the records provided by Counsel, it appears that his rate was less than $100 per hour. The total fee charged by Counsel was less than one-third of the total amount sought by Keystone. Counsel has been substantially successful in pursuing this collection matter for his client. Therefore, this Court awards Counsel attorney's fees in the amount of $12,383.
Moreover, § 9-21-10 provides, in part:
 "(a) In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date the cause of action accrued, which shall be included in the judgment entered therein. . . . This section shall not apply until entry of judgment or to any contractual obligation where interest is already provided."
Accordingly, pursuant to the plain language of § 9-21-10, Keystone shall receive 12% pre-judgment interest on the amount of the outstanding verdict from September 8, 1999. On that date, Agostini signed the Final Inspection, Release and Acceptance, and the cause of action accrued.
 Conclusion
After hearing and reviewing all the evidence before it, this Court renders the following judgments:
ACC shall pay Keystone $31,247.50 for overtime work based on the August 11th Modification, approved by ACC representatives, and submitted by Keystone to ACC in a properly formatted manner;
ACC shall pay Keystone $2,207.50 on ACC Change Orders #2 and #3, which formed valid modifications beyond the scope of the original agreement, and which were expressly assented to by representatives of ACC;
ACC shall be allowed a set-off in the amount of $13,750 for the direct payment that it made to Keystone's supplier, Motion Control Engineering, Inc.;
ACC shall be credited for the $8,000 payment that it made to Keystone, which Keystone accepted;
Keystone is the "prevailing party" and is entitled to statutory interest in the amount of 12% on the judgment entered, which by the Court's calculation is $11,705;
Pursuant to § 34-28-19, Keystone's Counsel is also entitled to attorney's fees and submitted an affidavit supporting his claim in the amount of $12,383, as supported by affidavit.
Counsel shall prepare an appropriate judgment in accordance with this decision for entry.
[1] Johnson Wales University, although a named defendant, does not appear separately in this action. Instead, it is jointly represented by the same counsel as the codefendant, Agostini Construction. Therefore, the term "Defendants" shall refer to actions taken in the name and on behalf of both Agostini Construction and Johnson Wales University.
[2] The following Keystone service invoices were properly verified, and accordingly shall be paid by ACC: 7519, 7510, 7516, 7509, 7507, 7508, 7506, 7521, 7520, 7522, 7523, 7524. Using Plaintiff's Exhibit #9 as a reference, the sum of these invoices totals $30,776.25. Keystone service invoices 7511 and 7517, totaling $942.50, contain illegible verifications apparently limiting the acceptance of the offer. The time payments on these two invoices shall be reduced by one-half to reflect the limitations as described. 
[3] To the extent that Keystone argues that it reduced its claim by $8,000 to reflect ACC's subsequent payment, this argument is rejected. ACC should not be charged for payments that this Court finds it did not owe. Therefore, Keystone must credit this subsequent payment to ACC's outstanding balance.
[4] Surprisingly, the January 23rd Agreement contains no "no waiver" clause.
[5] ACC has also arguably stated a claim for equitable subrogation. However, this Court's conclusions regarding unjust enrichment render a complete analysis of subrogation unnecessary.